IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| J.T., by and through his parents Renee and Floyd T., | CIVIL NO. 11-00612 LEK-BMK |
| Plaintiffs, | |
| vs. | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, et al. | |
| Defendants. | |

**ORDER REVERSING IN PART AND REMANDING
HEARINGS OFFICER'S ORDER DATED SEPTEMBER 12, 2011**

Before the Court is an appeal pursuant to the

Individuals with Disabilities in Education Act ("IDEA") by

Plaintiffs J.T., by and through his parents Renee and Floyd T.

(collectively, "Plaintiffs"), of the Administrative Hearings

Officer's (the "Hearings Officer") Findings of Fact, Conclusions

of Law, and Decision (the "Decision"[1]), filed on September 12,

2011.  Plaintiffs filed their Opening Brief in the present case

on February 15, 2012.  Defendant Department of Education, State

of Hawai'i (the "DOE") filed its Answering Brief on April 16,

2012, and Plaintiffs filed their Reply Brief on April 27, 2012.

The Court heard oral argument in this matter on May 7, 2012.

Appearing on behalf of Plaintiffs was John Dellera, Esq., and

---

[1] The Decision is located at Record on Appeal ("ROA") at
384-446.

appearing on behalf of the DOE was James E. Raymond, Esq.  After careful consideration of the parties' briefs, the arguments of counsel, and the relevant legal authority, the Decision is HEREBY REVERSED IN PART and REMANDED for the reasons set forth below.

## BACKGROUND

### I.   Factual and Administrative Background

J.T. is a twelve-year-old boy who was adopted by Renee T. shortly after his birth.  [Opening Brief at 1 (citing Pet.'s Exh. 8 at 1).]  Plaintiffs state that, from early in his life, J.T. suffered from sensory and developmental problems and had to receive occupational therapy, physical therapy, and speech therapy services provided by the State of Hawai'i Department of Health.  [Id. at 2 (citing Hrg. Trans. Vol. III at 292-93).] J.T. entered the DOE's pre-kindergarten special education program and received special education services in speech, math, and language arts from age three to five.  [Id. (citing Hrg. Trans. Vol. III at 294-95).]

During second and third grades, J.T.'s Present Levels of Educational Performance ("PLEP") put his academic performance at- or above-grade level in math, but indicated limited reading comprehension and writing skills.  [Id. at 3 (citing Resp.'s Exh. 4 at 17; Resp.'s Exh. 5 at 29; Resp.'s Exh. 6 at 40).] Plaintiffs question J.T.'s math assessment, claiming that he did not know how to do his homework, did not ask questions in class,

and performed below his grade level.  [Id. (citing Hrg. Trans. Vol. III at 295-98).]  Plaintiffs also claim that J.T. has difficulty communicating, answering questions, and expressing himself.  [Id. (citing Hrg. Trans. Vol. III at 299:15-21).]

In 2008, Plaintiffs sought consultation from psychologist Peggy Murphy-Hazzard, Psy.D., who examined J.T. and produced a neuropsychological evaluation dated February 25, 2009 (the "Murphy-Hazzard Report"), which concluded that J.T. had below-average to borderline verbal cognitive abilities, the possibility of an auditory processing disturbance, a basis for diagnosing attention deficit hyperactivity disorder (ADHD), and a basis for diagnosing a mixed, receptive-expressive language disorder.  [Id. at 3-4 (citing Pet.'s Exh. 9 at 94-95).]  The report recommended further evaluation of J.T. in order to rule out a reading disorder and central auditory processing disorder. [Id. (citing Pet.'s Exh. 9 at 96).]

As provided by the IDEA, Renee T. was a member of a team tasked with crafting an Individualized Education Program ("IEP") for J.T.  She claims that she expressed the same concerns at every IEP meeting:

> I would go through his language or his
> communication, not being able to communicate.
> I would bring up spelling.  I would bring up
> reading, math.  For this IEP I figured math
> problems were going to be coming up.  And he
> had the communication problems.  I brought up
> him shutting down.  Because if he's not
> asking questions that's why he can't do his

3

work.  And I was concerned for his grades.
[Id. at 4 (quoting Hrg. Trans. Vol. III at 302-03).]  Renee T.
claims that, although the other team members appeared to listen
to her concerns, the IEPs would not reflect issues such as mental
health, math, and communication.  [Id. at 4-5 (quoting Hrg.
Trans. Vol. III at 303:14-19).]  Plaintiffs posit that the IEP
team may have ignored Renee T.'s concerns because the teachers
did not take notice of his behavioral issues, as he would instead
"shut down."  [Id. at 5 (quoting Hrg. Trans. Vol. III at 306:12-
13).]  Plaintiffs point to an after-school incident in which J.T.
cut another student's finger with a pair of scissors.  [Id.
(quoting Hrg. Trans. Vol. III at 306:15-23).]

        At J.T.'s March 3, 2009 IEP meeting, Renee T. informed
the members of the IEP team that the Murphy-Hazzard Report was
forthcoming [id. at 4 (citing Hrg. Trans. Vol. III at 304:15-
19)], and she provided the team with a copy of the report in
March or April 2009 [id. at 5 (citing Hrg. Trans. Vol. III at
301:23-25)].  On May 14, 2009, J.T.'s regular-education teacher,
special-education teacher, student-services coordinator, and
Renee T. met to discuss the Murphy-Hazzard Report, but Plaintiffs
claim that the discussions had no impact on the IEP.  [Id.
(citing Pet.'s Exh. 4 at 63; Hrg. Trans. Vol. III at 308:11-17).]
Plaintiffs did not receive notice of the next IEP meeting, which
was held on May 29, 2009.  [Id. (citing Hrg. Trans. Vol. III at

308-09; Resp.'s Exh. 5 at 38).]  At that meeting, the IEP team, absent Renee T., developed PLEPs that referred to some of the findings of the Murphy-Hazzard Report, but did not include provisions for central auditory processing disorder, mixed receptive-expressive language disorder, or reading disorder. [Id. at 5-6 (citing Hrg. Trans. Vol. III at 310:3-7; Resp.'s Exh. 5 at 29).]

Plaintiffs contend that the March 3, 2009 PLEPs, which were prepared without consideration of the Murphy-Hazzard Report, and the May 29, 2009 PLEPs, which were prepared after Renee T. had provided the IEP team with a copy of the Murphy-Hazzard Report, were "essentially the same and focus exclusively on language arts, omitting behavioral, math, and auditory processing needs."  [Id. at 6 (citing Pet.'s Exh. 5 at 66; Pet.'s Exh. 4 at 47).]  The latter IEP allegedly does not reflect any change in goals and objectives.  [Id.]

On March 2, 2010, the DOE scheduled J.T.'s next IEP meeting for the following day.  Renee T. was not available to attend, and she instead suggested that they meet on March 5, 2010.  [Id. at 7 (citing Pet.'s Exh. 10 at 148).]  The DOE held the IEP meeting on March 3, 2010, without Renee T., and produced an IEP with goals and objectives identical to the previous IEPs. [Id. (citing Pet.'s Exh. 2 at 13-15).]  The DOE delivered a copy of the IEP to Renee T.'s home that day.  The IEP team

5

subsequently met on May 26, 2010 and June 22, 2010, with Renee T. present, to produce a revised IEP (the "combined June 2010 IEP"). [Decision at 49.]

By letter dated May 26, 2010, Renee T. informed the DOE that she "will place J.T. at Loveland Academy at State expense." [Opening Br. at 7 (quoting Pet.'s Exh. 10 at 140).]  J.T. began attending Loveland Academy in July 2010 for assessment, and he officially enrolled on November 10, 2010.  [Id. (citing Pet.'s Exh. 22 at 276; Hrg. Trans. Vol. III at 331:12-13).]

On or around March 2, 2011, J.T. filed a Request for Impartial Hearing.  [Id. at 8.]  The hearing took place between March 17 and 24, 2011, and the Hearings Officer issued his Decision on September 12, 2011.  [Id.]  The Hearings Officer's conclusions are summarized as follows:

(1) The DOE's failure to provide Plaintiffs with advanced notice of the May 29, 2009 IEP meeting resulted in a denial of a Free Appropriate Public Education ("FAPE"). [Decision at 46.]  The DOE improperly denied Renee T. an opportunity to participate in the formulation of the May 29, 2009 IEP.  [Id. at 48.]

(2) The DOE's failure to include Renee T. at the March 3, 2010 IEP meeting was excusable and did not result in a denial of FAPE.  [Id.]  There was no evidence that the DOE deliberately attempted to exclude Renee T., and the DOE

6

subsequently held two IEP revisions meetings with Renee T. that resulted in the combined June 2010 IEP.  [Id. at 49.]

(3) The combined June 2010 IEP was not a denial of FAPE.  [Id. at 50-56.]  The Hearings Officer determined that Dr. Murphy-Hazzard "did not do an adequate study of Student and that the report's diagnosis of Student in the mental health area is not adequate to raise concerns by the DOE insofar as Student's education is concerned."  [Id. at 51.]  He noted that the basis for the report is one-sided and did not pertain to any mental-health behaviors in the school setting.  [Id. at 52.]

(4) J.T. is not entitled to reimbursement and/or direct payments for J.T.'s placement at Loveland during the 2010-11 school year.  [Id. at 56.]  The Hearings Officer made no finding as to whether Loveland Academy was "appropriate" for J.T.  [Id.]

(5) J.T.'s speech-language needs should have been evaluated in 2009, but, when the DOE finally attempted to institute an evaluation process in 2010, Renee T. failed to cooperate with the DOE.  The Hearings Officer determined that, if "a future full assessment of Student results in a finding that he has one of [sic] both of these disorders [i.e., mixed receptive-expressive disorder and/or an auditory processing disorder], Student should receive the equivalent of an additional year of speech-language services appropriate to Student's situation at the time of such a finding or findings."  [Id. at 63.]

Plaintiffs filed this appeal from the Decision on October 12, 2011.  [Opening Br. at 9.]

## II.  **Plaintiffs' Opening Brief**

Plaintiffs appeal the Decision on the grounds that: (1) Renee T. was denied meaningful participation at the IEP team meetings; (2) the DOE denied J.T. a FAPE by creating inadequate IEPs and failing to diagnose his mental health issues and speech-language disorders; (3) he is entitled to reimbursement of his tuition at Loveland Academy; and (4) he is entitled to compensatory education.  They request that the Court vacate the Decision and order the DOE to: (1) pay J.T.'s tuition and related costs at Loveland Academy from November 10, 2010 until placement is changed in accordance with the law; (2) reimburse J.T. for the cost of evaluations by Dr. Murphy-Hazzard and Karen Tyson, Psy.D.; (3) award compensatory education at Loveland Academy for two years; and (4) pay J.T.'s attorneys' fees and costs.  [Id. at 36-37.]

Regarding the standard of review, Plaintiffs argue that "[d]istrict courts have discretion concerning how much deference to give to hearings officers appointed under the IDEA."  [Id. at 10 (citing Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)).]  They state that courts only need give findings "due weight," J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 949 (9th Cir. 2010), and "the ultimate determination of

whether an IEP was appropriate is reviewed de novo." A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist., 627 F.3d 773, 778 (9th Cir. 2010).   Determination of whether a state has offered a FAPE requires a two-part inquiry: (1) whether the state complied with the procedures set forth in the IDEA, and (2) whether the IEP developed is reasonably calculated to enable the child to receive educational benefits.  [Opening Br. at 10-11 (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982)).]  "Procedural deficiencies that result in the loss of educational opportunity or that infringe upon the parent's opportunity to participate in the IEP process in a meaningful way require a finding of denial of FAPE."  [Id. at 11 (citing W.G. v. Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992)).]

A.    **Parent's Participation in IEP Meetings**

Plaintiffs first argue that the Hearings Officer failed to uphold Renee T.'s right to meaningfully participate in IEP meetings.  Plaintiffs cite to a number of ways in which the IDEA guarantees parental rights, including the inclusion of a parent on the child's IEP team.  [Id. at 11-12.]

1.    **Attendance at IEP Meetings**

Plaintiffs argue that the DOE denied Renee T. the opportunity to participate at IEP meetings.  They contend that, with regard to the May 29, 2009 IEP, for which the Hearings Officer determined that J.T. was denied a FAPE, the Hearings

9

Officer should have immediately remedied the violation, rather than conditioning the award of one-year compensatory education on a future evaluation. [<u>Id.</u> at 12-13 (citing <u>Parents of Student W. v. Puyallup Sch. Dist., No. 3</u>, 31 F.3d 1489, 1497 (9th Cir. 1994) (it "may be a rare case when compensatory education is not appropriate")).]

        With regard to the Hearings Officer's ruling that the DOE's refusal to reschedule the March 3, 2010 IEP meeting to accommodate Renee T. did not implicate a denial of FAPE, Plaintiffs contend that the Hearings Officer erred. [<u>Id.</u> at 13.] The Hearings Officer reasoned that the DOE was "put in a bind" by its March 3, 2010 internal deadline and that the IEP developed at that meeting was not "the definitive IEP," since it was revised at subsequent meetings with Renee T. present. [<u>Id.</u> at 13 (citing Decision at 48-49).] According to Plaintiffs, however, the DOE could have postponed that meeting, because March 3, 2010 was merely an "arbitrary date" that the DOE selected for its review, as the actual "due date" for an IEP is the beginning of the following school year. [<u>Id.</u> at 13-14 (citing 34 C.F.R. § 300.323(a)).] Plaintiffs argue that, even if the DOE were held to the March 3 deadline, it was the DOE's own fault that it was forced to proceed with the meeting. The IEP team had to reschedule a meeting set for February 26, 2010. [<u>Id.</u> at 14 (citing Pet.'s Exh. 10 at 147; Hrg. Trans. Vol. III at 311:18-

25).]  Renee T. apparently could not meet at the scheduled time
on March 3, 2010 and suggested four other dates.  [Id. (citing
Pet.'s Exh. 10 at 148).]  The IEP team instead met without Renee
T., allegedly "for no good reason."  [Id. (citing Pet.'s Exh. 10
at 146 ("being that March 3, 2010 was [J.T.]'s IEP annual due
date, in [J.T.]'s best interest we proceeded with his annual IEP
meeting")).]  According to Plaintiffs, the DOE violated IDEA
procedure when it favored its internal deadline over Renee T.'s
schedule.  [Id. at 14-15 (citing Shapiro ex rel. Shapiro v.
Paradise Valley Unified Sch. Dist. No. 69, 317 F.3d 1072, 1078
(9th Cir. 2003)).]

        Plaintiffs also argue that "the IDEA requires that
parents have a full and meaningful opportunity to attend every
IEP meeting."  [Id. at 15 (emphasis in original).]  They state
that, if parents are excluded from IEP meetings, it is harder for
them to convince the other team members to change their minds at
later meetings.  [Id.]

### 2.   Meaningful Participation by Parent

        Plaintiffs next argue that the Hearings Officer erred
in finding that J.T. had no mental health or behavioral needs and
disregarding "one-sided" information Renee T. provided insofar as
it "was not substantially grounded in Student's educational
setting."  [Id. at 16 (quoting Decision at 52).]  Renee T. had
testified that J.T.'s teachers were not interested in her input

and addressed only needs that manifested at school: (1) the DOE discontinued J.T.'s special education services in math, despite Renee T.'s claim that he was still struggling with homework; [id. (citing Hrg. Trans. Vol. III at 295:12);] (2) Renee T. sought help from a psychologist because J.T. was allegedly having tantrums at home and not asking questions at school; [id. (citing Hrg. Trans. Vol. III at 299-300);] (3) Renee T. shared her concerns about J.T.'s behavior at IEP meetings, but the IEPs did not reflect her concerns; [id. at 16-17 (citing Hrg. Trans. Vol. III at 303:14-19);] and (4) although the DOE issued a Prior Written Notice ("PWN") on May 14, 2009 indicating that the IEP would take into account the Murphy-Hazzard Report, the May 29, 2009 IEP did not include any of the Murphy-Hazzard Report's recommendations [id. at 17 (citing Pet.'s Exh. 4 at 60-61)].

Plaintiffs claim that, after the March 3, 2010 IEP meeting that Renee T. could not attend, the DOE held subsequent IEP meetings, but the IEP team ignored Renee T.'s concerns. [Id. at 17-18 (quoting Hrg. Trans. Vol. III at 316-18).] Plaintiffs contend that the Hearings Officer disregarded Renee T.'s testimony regarding J.T.'s alleged behavioral problems and erroneously "dismissed Dr. Murphy-Hazzard's diagnosis because she considered information provided by Parent." [Id. at 18 (emphasis in original).] Plaintiffs conclude that the DOE's denial of meaningful parental participation was a substantial procedural

12

violation of the IDEA that denied J.T. a FAPE.  [Id.]

**B.   Other Denials of FAPE**

**1.   Failure to Evaluate Suspected Disabilities**

Plaintiffs argue that the DOE denied J.T. a FAPE when it failed to evaluate him at his mother's request.  [Id. at 19 (citing 20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. § 300.303(a)(2)).]  They argue that a school district is under an absolute obligation to assess all areas of suspected disabilities, and failure to do so may constitute a procedural denial of FAPE.  [Id. at 19-20 (citing Park ex rel. Park v. Aneheim Union High Sch. Dist., 464 F.3d 1025, 1031-33 (9th Cir. 2006); Pasatiempo ex rel. Pasatiempo v. Aizawa, 103 F.3d 796, 802 (9th Cir. 1996); N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1209 (9th Cir. 2008); Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877 (9th Cir. 2001); Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994)).]  Plaintiffs claim that, if the parent disagrees with the school district's evaluation, the parent has a right to an independent evaluation at the public's expense.  [Id. at 19 (citing 34 C.F.R. § 300.502).]

**a.   Mental-Health Issues**

Plaintiffs take issue with the Hearings Officer's finding that the DOE had no reason to suspect J.T. had mental-health problems because he did not experience problems at school.

They argue that such a determination "is against the weight of the evidence, applies the wrong legal standard, and is contrary to law." [Id. at 20.]

As to Plaintiffs' first argument, that the Hearings Officer's conclusions were against the weight of the evidence, Plaintiffs argue that "substantial evidence was offered to the IEP team that J.T. had behavioral problems that impaired his ability to do homework and to learn in class.  The evidence was either ignored or erroneously disregarded by the hearings officer[.]" [Id. at 23.]

Plaintiffs take issue with the testimony of Glorilynn Manding, J.T.'s special-education teacher.  They argue that, although Ms. Manding testified that she did not notice any behavioral problems (other than that J.T. was "impulsive in blurting out words"), she was not a mental health expert able to diagnose J.T.'s mental-health disabilities.  [Id. at 21 (citing Hrg. Trans. Vol. III at 382:12-13, 399:20-24).]  They point to Ms. Manding's testimony that the teachers on the IEP team considered the Murphy-Hazzard Report only insofar as it applied to the educational setting.  [Id. (quoting Hrg. Trans. Vol. III at 386:23-24).]

Plaintiffs also take issue with the testimony of Esther Parish, J.T.'s special-education teacher in 2009-10.  She testified that J.T. did not need mental-health services because

14

his behavioral problems did not manifest in class.  [Id. at 22 (citing Hrg. Trans. Vol. III at 411, 417-18).]

Plaintiffs challenge the testimony of school psychologist Renee Bergeron, who allegedly never met or observed J.T., but only reviewed his records and interviewed his special-education teachers.  [Id. at 22 (citing Hrg. Trans. Vol. IV at 471-72).]  Dr. Bergeron concluded that J.T. did not need mental health services because he was "progressing" and his teachers did not have "any mental health concerns."  [Id. (quoting Hrg. Trans. Vol. IV at 477:14-15).]

Plaintiffs point to other evidence presented to the IEP team and the Hearings Officer allegedly demonstrating that J.T. suffered from behavioral problems: (1) the Murphy-Hazzard Report mentioned hyperactivity, inattention, impulsivity, and anxiety that "provide a clear basis for diagnosing ADHD, combined type"; [id. at 23 (citing Pet.'s Exh. 9 at 95);] (2) Renee T.'s concerns regarding J.T.'s anxiety, tantrums, and "shutting down" in class; [id. (citing Hrg. Trans. Vol. III at 299:15-24);] (3) the incident in which J.T. cut another child's finger with a pair of scissors; [id. (citing Hrg. Trans. Vol. III at 306:15-23);] (4) reports from Loveland Academy that J.T. is an introvert who "internalize[s] his emotions," "shut[s] down, avoid[s] instructions, and stop[s] communicating," and has acted out aggressively towards peers [id. at 23-24 (citing Pet.'s Exh. 16

15

222222222222222222222222222222222222222222222222222

at 230; Hrg. Trans. Vol. II at 172:14-24, 193:14-16)].

Plaintiffs argue that the Hearings Officer's determination that J.T.'s behavior at Loveland Academy was the result of being "uprooted" from his home school, changing his teachers, and placing him in a program that "was not challenging enough" was unsupported by the record and contrary to evidence that Loveland Academy placed J.T. in a program for children with socialization and behavioral problems. [Id. at 24 (citing Decision at 53).] J.T.'s aide at Loveland Academy testified that he "still has deficits and social skills of the young kids," although "[h]is academic group is with peers at the same level." [Id. at 25 (quoting Hrg. Trans. Vol. II at 173-74).]

As to Plaintiffs' second argument, that the Hearings Officer applied the wrong legal standard, they argue that the Hearings Officer improperly ignored the DOE's failure to consider J.T.'s behavior outside of an educational setting. [Id. at 25-26.] Plaintiffs contend that the DOE "was required to consider all relevant information (especially that provided by the parent, see 20 U.S.C. § 1414(c)(1)(A)(i))," and it even admitted that information not observed at school should be considered in evaluating speech-language disorders. [Id. at 26 (citing Pet.'s Exh. 2 at 7).]

As to Plaintiffs' third argument, that the Hearings Officer reached conclusions contrary to law, Plaintiffs argue

16

that the Hearings Officer erred in finding that the DOE did not violate its duty to conduct a mental-health evaluation: (1) the Hearings Officer speculated that behavioral problems would have been reported to J.T.'s special-education teachers and failed to recognize that those teachers were not qualified to identify mental-health problems; [id. at 27 (citing Decision at 52);] (2) the Hearings Officer dismissed the Murphy-Hazzard Report because it was based "one-sidedly" on information that Renee T. provided, even though Dr. Murphy-Hazzard also considered standardized tests and her own observations of J.T.; [id. (citing Decision at 51; Pet.'s Exh. 9 at 87);] and (3) the Hearings Officer's speculation that J.T.'s behavioral problems at Loveland may be caused by "uprooting" J.T. from public school was unsupported by evidence [id. (citing Decision at 53)].

### b.   **Speech-Language Disorders**

Plaintiffs argue that the DOE's "belated" offer to evaluate him for speech-language disorders violated the IDEA. [Id. at 27-28.]  They state that the DOE failed to evaluate J.T. for central auditory processing disorder and mixed receptive-expressive disorder, as recommended by the Murphy-Hazzard Report. [Id. at 27.]  Although the Hearings Officer agreed with J.T. on this point, he concluded that the DOE's offer to evaluate J.T. was sufficient such that the DOE did not violate the IDEA.  [Id. at 28 (citing Decision at 55).]

17

### 2.   Inadequate IEPs

Plaintiffs next argue that the DOE created inadequate IEPs to meet J.T.'s educational needs.  They state that the DOE is required to develop IEPs reasonably calculated to enable disabled students to receive educational benefits by providing personalized instruction with sufficient support services to allow the child to benefit educationally.  [Id. (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 203-04 (1982)).]  Plaintiffs contend that the Hearings Officer "completely ignored" the requirement in 20 U.S.C. § 1414(d)(1)(A)(i)(bb) that an IEP meet "each of the child's other educational needs that result from the child's disability."  [Id. at 29.]  Plaintiffs offer a number of goals and objectives, based on his assessments at Loveland Academy, that should have been included in his IEPs: mental-health goals, after-school program, speech-language services, and tutoring in mathematics.  [Id. at 29-30.]

### C.   Reimbursement for Placement at Loveland Academy

### 1.   Reimbursement Standards

Plaintiffs further argue that the Hearings Officer erred when he denied J.T. reimbursement for his education at Loveland Academy.  They state that "[r]eimbursement for the costs of a unilateral private placement is generally awarded where the school district has denied a FAPE and the private placement is a proper one."  [Id. at 30 (citing Sch. Comm. of Burlington v.

18

Dep't of Educ., 471 U.S. 359 (1985); <u>Florence Cnty. Sch. Dist.
Four v. Carter ex rel. Carter</u>, 510 U.S. 7 (1993)).]  They argue
that the Hearings Officer erred when he found that J.T. did not
have mental-health needs and was not entitled to reimbursement
for placement at Loveland Academy, merely because Renee T.
unilaterally placed him at Loveland Academy specifically "because
of its program dealing with mental health needs."  [<u>Id.</u> at 31
(quoting Decision at 56).]  Rather, they argue that (1) the DOE
denied him FAPE (as discussed earlier), and (2) Loveland Academy
is a proper placement.

      As to that second contention, Plaintiffs cite to the
Ninth Circuit's decision in <u>C.B. ex rel. Baquerizo v. Garden
Grove Unified School District</u>, 635 F.3d 1155, 1159 (9th Cir.
2011), for the proposition that, "[t]o qualify for reimbursement
under the IDEA, parents need . . . only demonstrate that the
placement provides educational instruction specially designed to
meet the unique needs of a handicapped child, supported by such
services as are necessary to permit the child to benefit from
instruction."  [<u>Id.</u> at 32.]  Plaintiffs state that "[t]here is no
question that Loveland offers J.T. a program that meets his
needs, and that he is making progress."  [<u>Id.</u> (citing Pet.'s Exh.
13; Pet.'s Exh. 25 at 323, 305).]  Plaintiffs state that Loveland
Academy is a proper placement and request reimbursement for its
tuition and costs.  [<u>Id.</u> at 32-33.]

2.   **Statute of Limitations**

Plaintiffs argue that there is no merit to the DOE's anticipated statute of limitations defense.  Hawai'i Revised Statutes § 302A-443(a)(2) requires that a parent must request a due process hearing within 180 days of the unilateral placement in order to seek reimbursement of the private-school tuition. [Id. at 33 (citing Haw. Rev. Stat. § 302A-443(a)(2)).]  According to Plaintiffs, the facts are not in dispute that: Renee T. gave the DOE notice on May 26, 2010 that she intended to place J.T. at Loveland Academy; [id. (citing Pet.'s Exh. 10 at 140);] he withdrew from public school for evaluation at Loveland Academy in July 2010; [id. (citing Hrg. Trans. Vol. I at 32-33);] and he enrolled at Loveland Academy on November 10, 2010 [id. (citing Pet.'s Exh. 22 at 276)].  Plaintiffs filed the due process complaint on March 2, 2011, which is 214 days after the start of J.T.'s evaluation at Loveland Academy, but 112 days after his official enrollment at Loveland Academy.  [Id. (citing Resp.'s Exh. 1).]

Plaintiffs argue that the policy behind the statute of limitations defense precludes the DOE's argument.  They state that the purpose of the statute of limitations is to bar stale claims where, due to the amount of time that has passed, it is impossible to determine their truth.  [Id. at 33-34 (citing Yoshizaki v. Hilo Hosp., 50 Haw. 150, 433 P.2d 220 (1967);

20

<u>Riddlesbarger v. Hartford Ins. Co.</u>, 74 U.S. 386, 390 (1868)).]
In this case, they argue, the DOE knew at the May 26, 2010 IEP
meeting that J.T. would be evaluated for placement at Loveland
Academy.  [<u>Id.</u> at 34 (citing Pet.'s Exh. 10 at 140).]  By letter
dated September 27, 2010 (likely in response to the DOE's letter
of September 17, 2010, which suggested "educational neglect" for
J.T.'s non-attendance), Renee T. advised the DOE that J.T. "is
being placed at Loveland Academy.  He is being assessed for
placement and undergoing diagnostic prescriptive teaching."  [<u>Id.</u>
(quoting Pet.'s Exh. 10 at 115).]  Plaintiffs state that the DOE
acknowledged his enrollment by letters dated September 28, 2010
and September 30, 2010.  [<u>Id.</u> at 34-35 (citing Pet.'s Exh. 10 at
112-14).]  Plaintiffs request that the Court order the DOE to
reimburse them for J.T.'s tuition at Loveland Academy beginning
from November 10, 2010 until placement is changed by law.

    D.   **Compensatory Education**

        Plaintiffs' last argument involves their request for
compensatory education.  Plaintiffs argue that Renee T.'s
exclusion from the May 29, 2009 IEP meeting resulted in
inadequate consideration of the Murphy-Hazzard Report regarding
J.T.'s suspected disabilities, improper PLEPs, and inadequate
goals and objectives.  Plaintiffs contend that the DOE deprived
J.T. of necessary services from March 3, 3009 to July 2010, and
that the Hearings Officer's award of compensatory education

contingent upon an evaluation in the undetermined future is effectively a denial of compensatory education.  [Id. at 35-36.]

## III.  **Defendant's Answering Brief**

In its Answering Brief, the DOE first discusses the level of deference the Court should afford the Decision. [Answering Br. at 10-11.]  The DOE argues that the Decision "must be afforded considerable deference and should not be disturbed." [Id. at 11.]  It states that the Hearings Officer carefully considered and weighed the evidence, was fully engaged in the evidentiary portion of the hearing, carefully evaluated counsels' objections, did not favor either side, was in the best position to weigh and consider objections, and supported his Decision with an extensive Findings of Fact and numerous citations to the record.  [Id. at 10-11.]

### A.  **Parent's Participation in IEP Meetings**

#### 1.  **Attendance at IEP Meetings**

The DOE first notes that, in accordance with the Target Range rule applied by the Ninth Circuit in L.M. v. Capistrano Unified School District, 556 F.3d 900, 909 (9th Cir. 2009), which provides that procedural deficiencies that cause the loss of educational opportunity or seriously infringe on the parents' ability to take part in the IEP process result in the denial of FAPE, the Hearings Officer ruled that J.T.'s parents' exclusion from the May 29, 2009 IEP meeting resulted in a denial of FAPE.

22

[Id. at 12.]  The Hearings Officer awarded J.T. compensatory education for this violation.

The DOE next points to the Hearings Officer's conclusion that Renee T.'s non-attendance at the March 3, 2010 IEP meeting did not deny J.T. a FAPE.  It highlights the Hearings Officer's determination that the DOE attempted to schedule a meeting to meet the March 3, 2010 annual IEP review date and argues that whether or not March 3 was the actual review date is irrelevant to the analysis, as the DOE believed it to be so and acted to meet that deadline.  [Id. at 13 & n.2.]  In determining that the DOE did not deny J.T. a FAPE, the Hearings Officer examined the effect of Renee T.'s absence on the IEP formulation and noted: (1) the DOE knew that the March 3, 2010 IEP was not the final IEP; [id. at 13-14 (citing Hrg. Trans. Vol. III at 431:1-22);] (2) the DOE promptly delivered the March 3, 2010 IEP to Renee T.'s home; [id. at 14 (citing Hrg. Trans. Vol. III at 431:12);] (3) the DOE told Renee T. that a revised IEP was warranted; [id. (citing Hrg. Trans. Vol. III at 431:12-14);] (4) the DOE cooperated with Renee T. to schedule another IEP meeting; [id. (citing Hrg. Trans. Vol. III 352-53, 408:1-15);] and (5) the DOE held two additional IEP meetings to revise the March 3, 2010 IEP, with Renee T. and an advocate in attendance [id. (citing Pet.'s Exh. 2 at 9-23)].

### 2.   **Meaningful Participation by Parents**

With regard to Plaintiffs' argument that the IEP team disregarded Renee T.'s input, the DOE argues that, just because the DOE members of the IEP team did not always agree with Renee T., it does not mean that they did not consider her concerns.  [Id. at 14-15.]  The DOE cites to the Ninth Circuit's decision in Ms. S. ex rel. G. v. Vashon Island School District, 337 F.3d 1115, 1131-32 (9th Cir. 2003), which held that a public school "has no obligation to grant [parent] a veto over any individual IEP provision."  [Id. at 15 (quoting Ms. S., 337 F.3d at 1131) (alteration in Answering Brief)).]  That case relied on Doe ex rel. Gonzales v. Maher, 793 F.2d 1470, 1490 (9th Cir. 1986), which recognized that, in the absence of agreement between IEP team members, the agency has a duty to formulate the IEP to the best of its ability.  The DOE argues that the Hearings Officer acted within his discretion and based his findings on an evaluation of the conflicting evidence.  [Answering Br. at 15.]

**B.   Other Alleged Denials of FAPE**

### 1.   **Obligations to Evaluate Suspected Disabilities Under the "Child Find" Provisions of the IDEA**

As to Plaintiffs' argument that the DOE failed to identify and evaluate J.T.'s alleged mental-health and speech-language disorders as required by the "child find"[2] provisions of

---

[2] The "child find" regulations of 34 C.F.R. § 300.111 state,
(continued...)

the IDEA, the DOE states that the Hearings Officer identified

J.T.'s parents' concerns regarding J.T.'s needs.  [Id. at 16.]

### a.   The "Child Find" Obligations to Evaluate Mental-Health Issues

The DOE argues that, despite Plaintiffs' position that

the DOE's failure to perform a mental-health evaluation resulted

in a denial of FAPE, the IEP team correctly found no reason to

---

(...continued)
in pertinent part:

    (a) General.

        (1) The State must have in effect
        policies and procedures to ensure that -

            (i) All children with disabilities
            residing in the State, . . .
            regardless of the severity of their
            disability, and who are in need of
            special education and related
            services, are identified, located,
            and evaluated; and

            (ii) A practical method is
            developed and implemented to
            determine which children are
            currently receiving needed special
            education and related services.

    . . . .

    (c) Other children in child find. Child find
    also must include -

        (1) Children who are suspected of
        being a child with a disability
        under § 300.8 and in need of
        special education, even though they
        are advancing from grade to
        grade . . . .

include any functional behavioral assessments, behavioral-support plans, or mental-health services in the IEP.  [Id. at 16-17 (citing Hrg. Trans. Vol. III at 409-10, 418).]

Regarding Plaintiffs' argument that the Murphy-Hazzard Report triggered the DOE's duty to evaluate J.T. for behavioral issues, the DOE argues that the weight of the evidence supported the Hearings Officer's determination that the Murphy-Hazzard Report did not require mental-health evaluations.  [Id. at 17.] The DOE points to a number of the Hearings Officer's findings: (1) the Murphy-Hazzard Report was based in part on Renee T.'s statements, even though she never observed J.T. in an educational setting; [id. (citing Pet.'s Exh. 9 at 90; Hrg. Trans. Vol. III at 335:8-20);] (2) the Murphy-Hazzard Report was not based on any personal observation of J.T. in an educational setting or on any input from teachers; [id. at 18 (citing Tr. Hr'g of Vol. II at 275-76);] (3) there was evidence that J.T. did not exhibit behavior implicating mental health issues during the 2008-09 and 2009-10 school years, relying particularly on the testimony of J.T.'s special-education teachers; [id. at 18-19 (citing Decision at 52);] (4) there was a "stark contrast" in the evidence regarding J.T.'s behavior and mental health concerns at the public and private schools; [id. at 19 (citing Decision at 52; Pet.'s Exh. 16);] and (5) Renee T.'s only sources of information regarding J.T.'s behavior at his public school are from J.T.'s

sibling and one comment on J.T.'s report card [id. at 20 (citing Decision at 53; Hrg. Trans. Vol. III at 307:6-12).]

Regarding Plaintiffs' argument that the DOE was required to consider all relevant information, including information provided by Renee T., the DOE argues that the IEP team did consider Renee T.'s input, but ultimately did not incorporate all of her concerns into the IEP.  [Id. at 20.]  As the Ninth Circuit has acknowledged, parents do not have veto power over any particular IEP provision, and their recourse is through the administrative hearings process.  [Id. (citing Ms. S., 337 F.3d at 1131).]

Regarding Plaintiffs' argument that the Decision is contrary to law, the DOE takes the position that the Hearings Officer was correct in concluding that Plaintiffs failed to meet their burden regarding the DOE's "child find" duty.  [Id. at 20-21.]

### b.    The "Child Find" Obligation with Respect to Speech-Language Disorders

The DOE argues that the Hearings Officer found that there was sufficient evidence in the Murphy-Hazzard Report and other sources for the DOE to conclude that J.T. may have speech-language disabilities, but that the DOE came to the same conclusion, as reflected in the combined June 2010 IEP.  [Id. at 21 (citing Decision at 54-55).]  The DOE informed J.T.'s parents that speech-language assessment was necessary via the PWN dated

June 28, 2010.  [Id. (citing Decision at 54-55; Pet.'s Exh. 2 at
7).]  The Hearings Officer also noted that the DOE was prepared
to conduct an evaluation using qualified staff.  [Id. (citing
Decision at 55; Hrg. Trans. Vol. IV at 463-64).]  The DOE
contends that it was Renee T. who halted the DOE's evaluation
because she did not want the DOE to evaluate J.T. until Loveland
Academy completed its placement evaluations.  [Id. at 21-22
(citing Hrg. Trans. Vol. III at 355:6-22).]

### 2.   Plaintiffs' Claim that IEPs are Inadequate on Additional Grounds

In response to Plaintiffs' argument that the goals,
objectives, and PLEPs of the IEPs were inadequate or
inappropriate to meet J.T.'s needs, the DOE argues that the
Hearings Officer properly considered the testimony of J.T.'s
teachers and correctly concluded that Plaintiffs failed to meet
their burden in demonstrating that the DOE failed to offer him
FAPE.  [Id. at 22-25.]

The DOE recounts the testimony of J.T.'s special-
education teachers.  Ms. Manding, J.T.'s third-grade special-
education teacher, testified about the development of the
March 3, 2009 and May 29, 2009 IEPs.  [Id. at 23 (citing Hrg.
Trans. Vol. III at 362-379).]  She testified that the PLEPs in
the March 3, 2009 IEP were accurate and that the goals and
objectives were sufficient.  [Id. (citing Hrg. Trans. Vol. III at
366:8-10).]  She testified that J.T. did not need special

28

education in mathematics and was performing well in the general-
education classroom.  [Id. at 23-24 (citing Hrg. Trans. Vol. III
at 365:6-9, 411:5-11).]

Ms. Parish, J.T.'s fourth-grade special education
teacher, testified about the development of the March 3, 2010 and
combined June 2010 IEPs.  [Id. at 24 (citing Hrg. Trans. Vol. III
at 406-16).]  She testified that the goals and objectives of the
March 3, 2010 IEP were appropriate and that J.T. was studying
mathematics in a fourth-grade general-education classroom.  [Id.
(citing Hrg. Trans. Vol. III at 406:14-16, 411:10-11).]

The DOE argues that the Hearings Officer correctly
discounted the testimony of Lesley Cook, Psy.D., J.T.'s
psychologist, who testified that the goals and objectives of the
IEPs were too advanced.  [Id. (citing Hrg. Trans. Vol. II at 228-
29, 232-33, 235-36, 238).]  Dr. Cook worked with J.T. at Loveland
Academy, which, the Hearings Officer determined, "definitely
underestimated Student's academic capabilities and . . .
contributed to Student's behaviors of concern at" Loveland
Academy.  [Id. at 24-25 (quoting Decision at 55-56; Pet.'s Exh.
16 at 231).]

The DOE states that, because the Hearings Officer
concluded that the May 29, 2009 IEP resulted in a denial of FAPE,
the issue of whether the preliminary March 3, 2009 IEP denied
J.T. a FAPE was moot.  [Id. at 25-26.]

The DOE states that the issue of the appropriateness of the preliminary March 3, 2010 IEP is moot.  The Hearings Officer found that the IEP team did not intend that IEP to be final and held two subsequent meetings with Renee T. present to produce the final IEP for the 2010-11 school year.  [Id. at 26-27 (citing Hrg. Trans. Vol. III at 408:1-15, 424:6-22, 425:2-15).]

## C.  Reimbursement to Plaintiffs and/or Direct Payment to Loveland Academy for School Tuition and Related Expenses

As an initial matter, the DOE notes that, in their Request for Impartial Hearing, Plaintiffs requested reimbursement for tuition paid during the 2010-11 school year, but, in their Opening Brief, Plaintiffs request reimbursement "from November 10, 2010 until placement is changed in accordance with law[.]"  [Id. at 27 n.10 (quoting Opening Br. at 36-37).]

The DOE argues that Plaintiffs are not entitled to reimbursement for tuition at Loveland Academy.  The Hearings Officer concluded that, since the DOE did not deny J.T. a FAPE during the 2010-11 school year with regard to mental health needs, yet Renee T. unilaterally placed him there because of mental health issues, the DOE did not have to reimburse Plaintiffs for the cost of tuition at Loveland Academy.  [Id. at 27 (citing Decision at 56; Hrg. Trans. Vol. III at 320:6-12).]

### 1.  Loveland Academy as an Appropriate Placement

Because the Hearings Officer determined that the DOE

30

did not deny J.T. a FAPE, he did not address whether Loveland Academy is an appropriate placement.  The DOE urges the Court to rule that, even if the DOE failed to provide J.T. a FAPE, Loveland Academy is not an appropriate placement, so Plaintiffs are not entitled to tuition reimbursement.  [Id. at 28.]

The DOE claims that the record before the Hearings Officer provided ample basis for concluding that Loveland Academy is not an appropriate placement: (1) J.T. does not receive special-education services at Loveland Academy from a licensed special-education teacher; [id. at 29;] and (2) based on the testimony of J.T.'s special-education teachers at his public school, his behavior has deteriorated since he moved to Loveland Academy [id. at 29 (citing Hrg. Trans. Vol. III at 379-85, 416-21)].

The DOE argues that the evidence purporting to demonstrate J.T.'s progress at Loveland Academy is irrelevant, as the only proper question is whether Loveland Academy is an appropriate placement.  [Id. at 28 (citing Burlington v. Dep't of Educ., 471 U.S. 359 (1985)).]

2.    **The 180-Day Statute of Limitations**

The DOE contends that Hawai'i Revised Statutes § 302A-433(a)(2) bars reimbursement for J.T.'s tuition and expenses at Loveland Academy.  Section 302A-433(a)(2) requires that a parent request a due process hearing within 180 days of placement.  The

31

Request for Hearing is dated March 2, 2011, and 180 days prior is
September 3, 2010.  The DOE argues that the evidence shows that
J.T. went to Loveland Academy in July 2010 and received
educational services, speech language services, and occupational
therapy services between July and November 2010.  [Id. at 31
(citing Hrg. Trans. Vol. I at 22-34, 54-56, 201-03).]  The DOE
argues that the letter in which the DOE alleged admitted that
J.T. started at Loveland Academy in September 2010 was merely to
ensure that J.T. was not truant, not to establish J.T.'s start
date at Loveland Academy.  [Id. at 32 n.11 (citing Opening Br. at
35; Pet.'s Exh. 10 at 112).]  The Hearings Officer did not reach
this issue, but noted that there is a "serious challenge to the
timeliness of Petitioners' request for compensation . . . .
Substantial evidence was heard at trial that Student was defacto
placed at Current Placement about three months before being
officially enrolled because Student was fully involved in an
educational setting and receiving the same educational services
as other students . . . ."  [Id. at 32 (citing Decision at 57
n.7).]  The DOE urges the court to find that reimbursement is
barred by the 180-day statute of limitations.

D.   **Plaintiffs' Claim for Compensatory Education**

As to the Hearings Officer's award of compensatory
education to J.T. contingent on an evaluation, the DOE argues
that the Hearings Officer's remedy was an equitable resolution

32

within the Hearings Officer's discretion.  Compensatory education
is not specifically mentioned in the IDEA, but the courts have
crafted compensatory education as a form of equitable relief.
[Id. at 32-33 (citing Burlington, 471 U.S. 359; Dep't of Educ. v.
Zachary B. ex rel. Jennifer B., Civ. No. 08-00499 JMS/LEK, 2009
WL 1585816 (D. Hawai'i June 5, 2009)).]  The DOE argues that the
remedy should "ensure that the student is appropriately educated
within the meaning of the [IDEA]," Park ex rel. Park v. Anaheim
Union High Sch. Dist., 464 F.3d 1025, 1033 (9th Cir. 2006), and
should be based on "individualized assessments," not a "cookie-
cutter approach,"  Reid ex rel. Reid v. District of Columbia, 401
F.3d 516, 523 (C.A.D.C. 2005).

        The DOE argues that the Hearings Officer determined
that the IEP team considered the Murphy-Hazzard Report at the
May 29, 2009 IEP meeting.  [Answering Br. at 34 (citing Resp.'s
Exh. 5 at 29-30).]  Based on the Murphy-Hazzard Report, the DOE
was willing and able to assess J.T. for mixed receptive-
expressive disorder and an auditory processing disorder during
the 2010-11 school year, but Renee T. postponed that assessment,
claiming that she wanted to wait until the assessments at
Loveland Academy were finished.  [Id. (citing Decision at 61;
Resp.'s Exh. 8 at 68; Hrg. Trans. Vol. III at 355:6-23).]
According to the DOE, the Hearings Officer correctly concluded
that the DOE was not at fault for not conducting the assessments

before the start of the 2010-11 school year.  [Id. (citing
Decision at 41).]  It argues that, even if the DOE denied J.T. a
FAPE with regard to speech-language services, "equitable
considerations would weigh against a compensatory award of
speech-language services based on a failure to perform
assessments in the summer of 2010."  [Id. at 35 (citing Reid, 401
F.3d at 524).]

          With regard to speech-language services following the
May 29, 2010 IEP, the Hearings Officer determined that the DOE
denied J.T. a FAPE.  The Hearings Officer awarded J.T. one year
of speech-language services as compensatory education, if a full
assessment found such services necessary, but he concluded that
there was no basis to order compensation for speech-language
services at Loveland Academy, because there was no evidence of
itemized costs.  [Id. (citing Decision at 62-63).]  The DOE
argues that the Hearings Officer's decision is an equitable
resolution.  [Id. at 36.]

     E.   **Plaintiffs' Claim for Reimbursement and/or
          Payment for the Psychological Evaluations**

          1.   **The Dr. Murphy-Hazzard Evaluation**

          The DOE states that Plaintiffs are, for the first time,
requesting reimbursement for the neuropsychological evaluation
conducted by Dr. Murphy-Hazzard.  [Id. (citing Opening Br. at 19
n.8, 37).]  It asks that the Court deny this request, as "there
is no duty on the part of the trial court or the appellate court

34

to create a claim which appellant has not spelled out in his [or her] pleading[.]"  [Id. at 36-37 (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975)).]

### 2.  **The Dr. Tyson Evaluation**

As for Plaintiffs' request for reimbursement for an evaluation by Dr. Tyson, the DOE argues that Plaintiffs waived the issue by not distinctly arguing it in their Opening Brief, as it was only mentioned in the conclusion.  [Id. at 37 (citing U.S. v. Kama, 394 F.3d 1236, 1238 (9th Cir. 2005)).]

The DOE argues that, even if the Court decides to address this issue, Plaintiffs' request lacks merit.  J.T. was already attending Loveland Academy when Dr. Tyson evaluated him on November 2, 2010.  [Id. (citing Hrg. Trans. Vol. I at 22-34, 54-56; Vol. II at 201-03).]  According to the DOE, the IDEA only allows reimbursement when the parent requests an independent educational evaluation ("IEE") and the educational agency fails to deny the request or seeks a hearing on the request and loses. [Id. (citing 34 C.F.R. § 300.502).]  The DOE argues that Plaintiffs' claim for reimbursement was ineligible because Renee T. admitted that she did not make a request for an IEE prior to seeking an assessment from Dr. Tyson.  [Id. at 37-38 (citing Hrg. Trans. Vol. III at 341:2-7).]

The DOE finally argues that a party cannot recover the cost of expert witnesses as a part of attorneys' fees and costs.

[Id. at 38 (citing Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291 (2006) (holding that the IDEA did not authorize a fee for expert witnesses over and above the attendance fee for witnesses)).] Because Dr. Tyson's report is dated shortly before Plaintiffs' request for due process hearing and Dr. Cook testified about that report as an expert witness, the DOE contends that, to the extent the reports form the basis of expert witness testimony, Plaintiffs cannot recover for the cost of preparing expert reports. [Id. (citing Decision at 60).]

IV.  **Plaintiffs' Reply Brief**

A.   **Procedural Requirements**

Plaintiffs first take issue with the DOE's position that they must prove violations of both prongs of the Rowley test. According to Plaintiffs, the DOE must comply with both requirements, and they need only prove that the DOE violated one of the requirements in order to prevail on the procedural violation issue. [Reply Br. at 1 (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982)).] Plaintiffs contend that they need only prove that the DOE substantially impaired the parental right to participate in the development of an IEP in order to demonstrate a denial of FAPE. [Id. at 1-2 (citing W.G. v. Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992); L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 910 (9th Cir. 2009)).]

36

Plaintiffs also argue that the issues on appeal do not involve weighing conflicting evidence, so the Court need not defer to the Hearings Officer's findings.  [Id. at 2.]

B.   **Parental Participation in the IEP Process**

1.   **Attendance at IEP Meetings**

Plaintiffs argue that the Hearings Officer should have found that the DOE's failure to include Renee T. in the March 3, 2010 IEP meeting denied J.T. a FAPE and that the Hearings Officer had no authority to excuse Renee T.'s exclusion from an IEP meeting.  [Id. at 3.]  They argue that the DOE's attempts to schedule the March 3, 2010 IEP meeting at a convenient time only consisted of: (1) inquiring about Renee T.'s availability two days before the meeting; (2) issuing a Conference Announcement a day before the meeting; and (3) leaving Renee T. voicemail messages on the day of the meeting.  [Id. at 4 (citing Pet.'s Exh. 10 at 146; Hrg. Trans. Vol. III at 351:15-352:6).]  Plaintiffs argue that the DOE failed to notify them of the meeting or offer alternative methods so as to allow them an opportunity to attend.  [Id. (citing Haw. Admin. R. § 8-60-46(a); 34 C.F.R. § 300.22(a)-(c)).]

2.   **"Meaningful Participation"**

Plaintiffs clarify that their argument is not that Renee T. should be able to veto IEP team decisions, but rather that she should be able to participate meaningfully.  [Id. at 5.]

They say that the IEP team members did not address Renee T.'s
concerns regarding speech-language problems and mental-health
problems until after she announced her intention to place J.T. at
Loveland Academy, and even then they only offered to assess
speech-language issues and not behavioral issues.  [<u>Id.</u> (citing
Pet.'s Exh. 2 at 7; Hrg. Trans. Vol. III at 426-27).]  Plaintiffs
direct the Court to United States Magistrate Judge Barry M.
Kurren's recent decision on March 9, 2012, in which he held that
it was an error for a hearings officer to ignore testimony of the
parent and private school teacher.  [<u>Id.</u> at 6 (citing <u>Nalu Y. ex
rel. Patty Y. v. Dep't of Educ.</u>, Civ. No. 11-00067 BMK, 2012 WL
844366 (D. Hawai'i Mar. 9, 2012)).]  Plaintiffs argue that,
similarly, the Hearings Officer erred in disregarding Renee T.'s
comments about J.T.'s difficulties merely because such behaviors
did not manifest in the classroom.  [<u>Id.</u>]

   C.   <u>Failure to Evaluate Suspected Disabilities</u>

        1.   <u>Mental-Health Issues</u>

        Although the DOE contends that the IEP team members
considered parental input, Plaintiffs reiterate their argument
that the IEP team failed to give those concerns serious
consideration.  [<u>Id.</u> at 7.]  Plaintiffs restate their earlier
argument that a parent's "informed suspicions" of disability are
sufficient to trigger the defendant's obligation to investigate.
[<u>Id.</u> at 8.]  They claim that J.T.'s two special-education

38

teachers only saw him for a limited amount of time each day in
classes with ten other students, are not trained in mental-health
issues, and only testified that they did not notice any irregular
behavior.  [Id.]  Plaintiffs argue that, although teacher input
is important, the Hearings Officer erred by disregarding the
concerns and opinions offered by Renee T., Dr. Murphy-Hazzard,
Dr. Cook, and Dr. Tyson.  [Id. at 8-9 (discussing M.B. ex rel.
Berns v. Hamilton Se. Schs., 668 F.3d 851 (7th Cir. 2011)).]

### 2.   Communication Disorders

Plaintiffs state that the Hearings Officer found that
the Murphy-Hazzard Report was sufficient to trigger an evaluation
of communication disabilities.  Although the Hearings Officer
determined that the May 29, 2009 IEP's failure to acknowledge a
need to assess J.T. constituted a denial of FAPE, Plaintiffs
argue that the Hearings Officer should have found that the DOE
failed in its duty to evaluate all suspected disabilities.  [Id.
at 9-10.]

### D.   Inadequate IEPs

Plaintiffs argue that J.T.'s four IEPs over two school
years were inadequate because they failed to address mental
health and communication needs.  Plaintiffs also argue that the
March 3, 2009, May 29, 2009, and March 3, 2010 IEPs were
inadequate because they limit J.T.'s special-education services
to 450 minutes per week.  [Id. at 10.]

39

Plaintiffs contend that, even if the Hearings Officer was correct that the DOE was relieved of its obligation to evaluate J.T. in June 2010 because Renee T. wanted to delay the testing, J.T. was still denied a FAPE from the time of the May 29, 2009 IEP, when the DOE had a duty to evaluate his possible communication disabilities.  [Id.]  As a result, Plaintiffs argue, subsequent IEPs did not contain accurate PLEPs, goals, and objectives.  [Id. at 10-11.]

### E.    Unilateral Placement at Loveland Academy

#### 1.    Right to Reimbursement or Payment of Tuition

Plaintiffs argue that, even if the DOE did not deny J.T. a FAPE during the 2010-11 school year, they are still entitled to tuition reimbursement for the denial of FAPE in 2009. [Id. at 11.]  They cite to 20 U.S.C. § 1412(a)(10)(c), which allegedly empowers a court "to order school authorities to reimburse parents for their expenditures on private special education . . . if the court ultimately determines that the placement, rather than a proposed IEP, is proper under the Act." [Id. at 11-12 (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985)).]

#### 2.    Loveland Academy as an Appropriate Placement

Plaintiffs respond to the DOE's argument that Loveland Academy is not an appropriate placement for J.T.  First, they argue that J.T. needs the mental health services identified by

the Murphy-Hazzard Report, as evidenced by the progress he has
made at Loveland Academy.  [Id. at 12.]  They argues that, even
if he does not need those services, the inclusion of unneeded
services does not make placement inappropriate.  [Id. at 12-13
(citing C.B. ex rel. Baquerizo v. Garden Grove Unified Sch.
Dist., 635 F.3d 1155, 1159 (9th Cir. 2011)).]  Second, they argue
that there is no requirement that private-school teachers be
licensed in Hawai'i.  [Id. at 13.]  Third, they argue that the
Murphy-Hazzard Report documented behavioral problems that
occurred before J.T. attended Loveland Academy, thus
demonstrating that the change in schools did not cause the
problems.  [Id. (citing Pet.'s Exh. 16 at 230; Pet.'s Exh. 17).]

### 3.   Statute of Limitations

Regarding the DOE's argument that the request for due
process hearing fell outside of the 180-day statute of
limitations period, Plaintiffs respond that the purpose of the
statute of limitations is not served by construing Loveland
Academy's pre-enrollment testing and evaluation as "placement."
[Id. at 14-15 (citing Haw. Rev. Stat. § 1-15(2).]  They also
argue that the 180-day period begins to run when a student
"enrolls" in private school, Makiko D. v. Hawaii, Civ. No. 06-
00189 JMS/BMK, 2007 WL 1153811, at *7 (D. Hawai'i Apr. 17, 2007),
and that the evidence here demonstrates that J.T. did not
"enroll" at Loveland Academy before September 3, 2010:

41

(1) Renee T. did not know until late September that he would
enroll there; [id. (citing Pet.'s Exh. 10 at 115);] (2) the DOE
acknowledged on September 30, 2010 that J.T. was withdrawing from
public school; [id. (citing Pet.'s Exh. 10 at 112-13);] and
(3) Loveland Academy's Day Treatment Academic Program shows a
"start date" of November 10, 2010 [id. (citing Pet.'s Exh. 22 at
276)].

F.    **Compensatory Education**

Plaintiffs argue that the Hearings Officer's award of
one year of speech-language services contingent on an evaluation
is not an "equitable resolution," as it does not ensure that J.T.
receives appropriate education.  [Id. (quoting Parents of Student
W. v. Puyallup Sch. Dist., No. 3, 31 F.3d 1489, 1497 (9th Cir.
1994)).]  They argue that the reason Renee T. asked to delay the
speech-language assessment was first a death in her family, then
because Loveland Academy was conducting its own evaluations.
[Id. at 16 (citing Pet.'s Exh. 6 at 75; Pet.'s Exh. 10 at 124-25,
127; Hrg. Trans. Vol. III at 355:12-19).]  Although the DOE
offered to reschedule the evaluation, correspondence thereafter
turned to addressing J.T.'s absence from public school.  [Id.
(citing Pet.'s Exh. 10 at 112, 121).]

As for the reimbursement of tuition for speech-language
services at Loveland Academy, Plaintiffs argue that the IDEA does
not require itemized costs as a prerequisite to recovery.  [Id.]

G.     __Reimbursement for Psychological Evaluation__

        Finally, Plaintiffs argue that they are entitled to
reimbursement for the costs associated with mental-health
evaluations.  They claim that the request for hearing sought
reimbursement for the evaluation conducted by Dr. Tyson.  [Id. at
17 (citing Pet.'s Exh. 1 at 5).]  They are instead seeking
reimbursement for the Murphy-Hazzard Report, arguing that it
should be treated as an independent evaluation under 34 C.F.R.
§ 300.502.  [Id. at 17-18.]  Plaintiffs argue that the present
claim for reimbursement is the same as the claim raised in the
due process hearing, and changing the name of the psychologist
associated with the evaluation does not change the claim itself.
[Id.]

**STANDARD**

I.     __Standard of Review__

        The standard for district court review of an
administrative decision under the IDEA is set forth in 20 U.S.C.
§ 1415(i)(2)(c), which provides:

                In any action brought under this paragraph,
                the court –

                        (i) shall receive the records of
                        the administrative proceedings;

                        (ii) shall hear additional evidence
                        at the request of a party; and

                        (iii) basing its decision on the
                        preponderance of the evidence,
                        shall grant such relief as the

43

court determines is appropriate.
20 U.S.C. § 1415(i)(2)(c).

This standard requires that "due weight" be given to the administrative proceedings. L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982)) (some citations omitted).  The amount of deference accorded is subject to the court's discretion.  J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 438 (9th Cir. 2010) (citing Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)).  In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said findings are "thorough and careful."  L.M., 556 F.3d at 908 (quoting Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)).  "Substantial weight" should be given to the hearings officer's decision when it "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented."  Cnty. of San Diego v. Cal. Special Educ. Hr'g Office, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation and quotation marks omitted)).  Such deference is appropriate because, "if the district court tried the case anew, the work of the hearings officer would not receive 'due weight,' and would be largely wasted."  Wartenberg, 59 F.3d at 891.

"[T]he ultimate determination of whether an IEP was appropriate,"
however, "is reviewed de novo." A.M. ex rel. Marshall v.
Monrovia Unified Sch. Dist., 627 F.3d 773, 778 (9th Cir. 2010)
(citing Wartenberg, 59 F.3d at 891).

A court's inquiry in reviewing IDEA administrative
decisions is twofold:

> "First, has the State complied with the
> procedures set forth in the Act?  And second,
> is the individualized educational program
> developed through the Act's procedures
> reasonably calculated to enable the child to
> receive educational benefits?"  [Rowley, 458
> U.S. at 206-07] (footnotes omitted).  "If
> these requirements are met, the State has
> complied with the obligations imposed by
> Congress and the courts can require no more."
> Id. at 207.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947 (9th Cir.
2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on
the party challenging the administrative ruling.  Hood v.
Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)
(citations omitted).  The challenging party must show, by a
preponderance of the evidence, that the hearing decision should
be reversed.  J.W., 626 F.3d at 438 (citing Clyde K. v. Puyallup
Sch. Dist., No. 3, 35 F.3d 1396, 1399 (9th Cir. 1994)).

## II.  IDEA Statutory Framework

"The IDEA is a comprehensive educational scheme,
conferring on disabled students a substantive right to public

education and providing financial assistance to enable states to
meet their educational needs." Hoeft v. Tucson Unified Sch.
Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing Honig v. Doe,
484 U.S. 305, 310 (1988)).  It ensures that "all children with
disabilities have available to them a free appropriate public
education that emphasizes special education and related services
designed to meet their unique needs and prepare them for further
education, employment, and independent living[.]"  20 U.S.C.
§ 1400(d)(1)(A).

        The IDEA defines FAPE as:

        special education and related services that -

                (A) have been provided at public
                expense, under public supervision and
                direction, and without charge;

                (B) meet the standards of the State
                educational agency;

                (C) include an appropriate preschool,
                elementary school, or secondary school
                education in the State involved; and

                (D) are provided in conformity with the
                individualized education program
                required under section 1414(d) of this
                title.

20 U.S.C. § 1401(9).  To provide FAPE in compliance with the
IDEA, a state educational agency receiving federal funds must
evaluate a student, determine whether that student is eligible
for special education, and formulate and implement an IEP.  See
generally 20 U.S.C. § 1414.  The IEP is to be developed by an

46

"IEP team" composed of school officials, parents, teachers and other persons knowledgeable about the child.  34 C.F.R. § 222.50; 20 U.S.C. § 1414(d)(1)(B).  The student's FAPE must be "tailored to the unique needs of the handicapped child" through an IEP. Rowley, 458 U.S. at 181 (citing 20 U.S.C. § 1401(18)).  Local or regional educational agencies must review, and, when appropriate, revise each child's IEP at least annually.  20 U.S.C. § 1414(d)(4).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education.  J.W., 626 F.3d at 439 (citation and internal quotation marks omitted).  Rather, school districts are required to provide only a "basic floor of opportunity."  Id. (quoting Rowley, 458 U.S. at 201).  The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit."  Id. at 433 (citations and quotation marks omitted).

If a parent disagrees with the contents of an IEP, the parent may challenge the contents thereof by demanding an administrative due process hearing to be conducted by the local or state educational agency.  See 20 U.S.C. § 1415(b)(6), (f)(1)(A).  Parents may also send their student to a private program and seek retroactive tuition reimbursement from the state.  See Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 240-47

47

(2009) (citations omitted).  Where parents unilaterally withdraw
a child from public school, they "do so at their own financial
risk."  Id. at 2496 (citations and internal quotation marks
omitted).  Parents challenging an IEP are entitled to
reimbursement only if "a federal court concludes both that the
public placement violated IDEA and the private school placement
was proper under the Act."  Id. (citations and internal quotation
marks omitted); see also 34 C.F.R. § 300.148(c).

**DISCUSSION**

I.   **The Hearings Officer Erred in Determining
     that the DOE did not Deny J.T. a FAPE**

          The gravamen of Plaintiffs' appeal is that the DOE
denied J.T. a FAPE when it created inadequate IEPs for him as a
result of excluding Renee T. from IEP meetings or dismissing her
concerns.  Specifically, the DOE's failure to (1) include
Renee T. in the May 29, 2009 IEP meeting, (2) include Renee T. in
the March 3, 2010 IEP meeting, and (3) consider the Murphy-
Hazzard Report and Renee T.'s mental health and communication
concerns procedurally violated the IDEA and warrant a partial
reversal of the Decision.

          The IDEA's procedural safeguards are designed to
achieve its substantive objections.  As the Ninth Circuit
explained: "When the elaborate and highly specific procedural
safeguards embodied in [IDEA] are contrasted with the general and
somewhat imprecise substantive admonitions contained in the Act,

48

we think that the importance Congress attached to these procedural safeguards cannot be gainsaid." J.G. v. Douglas Cnty. Sch. Dist., 552 F.3d 786, 794 (9th Cir. 2008) (quoting Rowley, 458 U.S. at 205) (alteration in original).

In drafting the IDEA, "Congress placed every bit as much emphasis upon compliance with procedures . . . as it did upon the measurement of the resulting IEP against a substantive standard." Rowley, 458 U.S. at 205-06. Procedural compliance "would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Id. at 206.

The Ninth Circuit has cautioned, however, that "[n]ot every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE." N.B. v. Hellgate Elementary Sch. Dist. ex rel. Bd. of Dirs., Missoula Cnty., 541 F.3d 1202, 1208 (9th Cir. 2008) (quoting Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877, 892 (9th Cir. 2001)). Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child." Id. (citations omitted). "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." L.M., 556 F.3d at 909.

49

A.   **The Hearings Officer Correctly Determined that the DOE Denied J.T. a FAPE by Improperly Excluding <u>Renee T. from the May 29, 2009 IEP Meeting</u>**

The Hearings Officer determined that the May 29, 2009 IEP meeting, held without Plaintiffs' input or presence, constituted a denial of FAPE.  [Decision at 46-48.] Specifically, the Hearings Officer found that the DOE failed to provide Renee T. with advanced notice of the meeting [<u>id.</u> at 46], that the DOE denied Renee T. an opportunity to participate in the formulation of the May 29, 2009 IEP [<u>id.</u> at 47], and that these procedural defects resulted in a denial of FAPE [<u>id.</u> at 48].  The DOE does not challenge this portion of the Decision.  [Answering Br. at 12.]  The Court thus upholds the Hearings Officer's finding that the DOE denied J.T. a FAPE when it did not give Renee T. a reasonable opportunity to attend the May 29, 2009 IEP meeting.

B.   **The DOE Denied J.T. a FAPE by not Allowing Renee T. a Reasonable Opportunity to Attend <u>the March 3, 2010 IEP Meeting</u>**

In contrast, the parties contest whether the DOE denied J.T. a FAPE in connection with the March 3, 2010 IEP.  The Hearings Officer determined that the DOE's failure to include Renee T. in the meeting was excusable, because (1) there was no evidence that the DOE purposefully excluded her, and (2) the DOE subsequently held two meetings to modify the IEP.  [Decision at 48-49.]  This Court reverses the Decision and concludes that the

50

exclusion of Renee T. from the March 3, 2010 meeting was not

excusable, and J.T. was procedurally denied a FAPE as a result of

Renee T.'s absence.

As to parental participation in the IEP process, the

Ninth Circuit has stated:

> Parental participation in the IEP
> process is an integral part of the IDEA.  See
> Amanda J., 267 F.3d at 890-91.  The
> regulations require the DOE to take steps to
> ensure that the parents of a disabled student
> is present at the IEP meeting, or at least
> afforded the opportunity to participate.  34
> C.F.R. § 300.322(a).  However, an IEP meeting
> may take place without a parent in attendance
> if the agency is "unable to convince the
> parent that they should attend."  Id.
> § 300.322(d).

K.D. ex rel. C.L. v. Dep't of Educ., 665 F.3d 1110, 1123-24 (9th

Cir. 2011).

In Drobnicki ex rel. Drobnicki v. Poway Unified School

District, 358 Fed. Appx. 788 (9th Cir. 2009), the Ninth Circuit

considered a somewhat similar factual situation.  In that case,

the school district informed the parents of a special-education

student that the IEP meeting was scheduled for October 10, but

the parents informed the school that they were unable to attend

that day and asked to reschedule the meeting.  The school

district did not make any further attempt to reach a mutually

agreeable time for the meeting and held the meeting in the

parents' absence.  Id. at 789-90.  The Ninth Circuit held:

> A school district must include the parents of
> a child with a disability in an IEP meeting
> "unless they affirmatively refuse[ ] to
> attend." <u>Shapiro [ex rel. Shapiro v.
> Paradise Valley Unified Sch. Dist. No. 69]</u>,
> 317 F.3d [1072,] 1078 [9th Cir. 2003].
> Daniel's parents did not affirmatively refuse
> to attend the October 10 IEP meeting.  When
> Poway called on October 10 to ask whether the
> Drobnickis were going to attend the IEP
> meeting, Mrs. Drobnicki asked to reschedule
> it.  The district court's finding to the
> contrary was clearly erroneous.

<u>Id.</u> at 790.  The court concluded that, "[b]y proceeding with the

October 10 IEP meeting without Daniel's parents, Poway violated

the IDEA."  <u>Id.</u>

        The <u>Drobnicki</u> court also addressed the remedial effect

of subsequent IEP meetings.  As in the present case, the

student's parents did not attend the IEP meeting in which the IEP

was formulated, but attended previous and subsequent meetings.

The school district argued that the parents' subsequent

attendance was sufficient, but the Ninth Circuit disagreed:

> Poway argues that the Drobnickis' right
> to participate in the formulation of Daniel's
> IEP was not significantly restricted because
> Mrs. Drobnicki attended IEP meetings in
> September and December.  It is undisputed,
> however, that Daniel's IEP was formulated at
> the October 10 meeting, not the September or
> December meetings.  Moreover,
> "[a]fter-the-fact parental involvement is not
> enough."  <u>Shapiro</u>, 317 F.3d at 1078.  Thus,
> "[Poway's] failure to include the persons
> most knowledgeable about [Daniel's]
> educational levels and needs - namely, . . .
> [Daniel's] parents - at the [October 10] IEP
> meeting . . . resulted in lost education
> opportunity for [Daniel]."  <u>Id.</u> at 1079.

> Accordingly, Daniel did not receive a FAPE
> for the 2005-06 school year, and the Court
> therefore need not reach the question whether
> Daniel's IEP substantively complied with the
> IDEA.

Id.  Similarly, the Ninth Circuit has noted that, although a school district "has no obligation to grant [a parent] a veto over any individual IEP provision[,]" it cannot exclude the parent.  Ms. S. ex rel. G. v. Vashon Island Sch. Dist., 337 F.3d 1115, 1131 (9th Cir. 2003), *superseded on other grounds by statute,* 20 U.S.C. § 1414(d).  "A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification."  Id. (citing W.G. v. Bd. of Tr. of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992)).  "'After-the-fact parental involvement is not enough,' and a school district may not be excused for lack of parental participation if it 'prioritize[s] its representatives' schedules over [those] of [the] parents.'"  Id. (quoting Shapiro, 317 F.3d at 1078) (alterations in Ms. S.).

The Court rules that the DOE's exclusion of Renee T. from the March 3, 2010 IEP meeting seriously infringed on her right to participate in the IEP formulation process.  The record shows that Renee T. was an active participant in the formulation of J.T.'s IEPs and desired to be included in the March 3, 2010 meeting, but the DOE would not reschedule the meeting to

reasonably accommodate her schedule.  The DOE informed Renee T. of the meeting the day before the meeting.  Renee T. asked that they reschedule the meeting on March 5, 2010.  The DOE was unable to contact Renee T. on March 3, 2010, and instead held the meeting without her.  The IEP team created a provisional IEP that they later revised on May 26, 2010 and June 22, 2010, with Renee T. present.  [Decision at 48-49.]

Renee T.'s after-the-fact participation is not enough to remedy the initial per se denial of FAPE caused by her exclusion.  As the Ninth Circuit held in Drobnicki, a school district violates the IDEA when it holds an IEP meeting in the parent's absence, when the parents ask to reschedule the meeting. 358 Fed. Appx. at 790.  The Ninth Circuit also rejected the argument that the DOE presents here, that subsequent meetings with the parent in attendance can cure the violation.  Id. Indeed, regarding the May 26, 2010 IEP meeting intended to supplement the March 3, 2010 meeting, Renee T. testified that the IEP team ignored her concerns and did not let her contribute her input.  [Hrg. Trans. Vol. III at 316-18.]  The subsequent meetings did not remedy Renee T.'s exclusion from the March 3, 2010 meeting, and her exclusion was a per se denial of FAPE.

The IEP team's scheduling of the March 3, 2010 meeting to meet its internal deadline is not a viable excuse.  The DOE argues that the IEP team needed to hold the meeting on March 3,

2010, because that was what it believed to be its internal deadline for creating IEPs for the following school year. [Answering Br. at 13.]  The DOE cites to no authority that allows it to prioritize its internal deadlines (which the DOE implicitly concedes may not have been the actual deadline [id. at 13 n.2]) or otherwise disregard Renee T.'s schedule.  Indeed, just as a school district may not "prioritize[ ] its representatives' schedules over [those] of [the] parents[,]" Shapiro, 317 F.3d at 1078 (some alterations in original), the DOE cannot prioritize its internal deadline over a parent's schedule, especially when the parent is given only a day's notice and makes a good-faith effort to reschedule.

C.     **The DOE Denied J.T. a FAPE by Disregarding the Murphy-Hazzard Report and Renee T.'s Observations of J.T. Outside of the Classroom**

The Court finds that the DOE denied J.T. a FAPE when the IEP team failed to consider the Murphy-Hazzard Report and Renee T.'s concerns about J.T.'s mental health and communication skills.  Underlying the IDEA is a policy that parental concerns and suspicions regarding their children's disabilities are just as important as the school district's observations.  The Court is instructed by Pasatiempo ex rel. Pasatiempo v. Aizawa, 103 F.3d 796 (9th Cir. 1996), where the Ninth Circuit addressed the required response to a parent's request for evaluation:

> By arguing that the procedural safeguards apply only when the DOE suspects

or believes a child is disabled, however, the
DOE asks that we grant it almost absolute
control over whether parents and students may
avail themselves of the procedural
protections offered under the IDEA and § 504.
This we decline to do, as there is nothing in
either the language or the legislative
history of the statutes that suggests that it
is the school district's suspicion or belief
alone that activates the procedural
safeguards. . . .

. . . .

The identification of children who have
disabilities should be a cooperative and
consultative process.  As is indicated by the
DOE's misdiagnosis of Tina Williams, DOE
determinations regarding a student's ability
can be flawed.  Such experiences suggest that
DOE determinations alone should not be
determinative.  The informed suspicions of
parents, who may have consulted outside
experts, should trigger the statutory
protections.  When DOE or the parents suspect
disability, the parents should receive
notification of, and have the opportunity to
contest, conclusions regarding their
children.

. . . .

The statutes and relevant regulations
refer to suspected disabilities; they aim to
encourage consultation between parents and
school districts.  This goal counsels against
interpreting the provisions to vest sole
discretion in the DOE to determine whether
consultation is available.  Rather, the
legislative emphasis upon joint
decisionmaking suggests that when a parent
suspects his or her child is disabled and
requests an evaluation, that suspicion should
be sufficient to place any subsequent action
or inaction taken with respect to that
request within the ambit of the IDEA and
§ 504.

Id. at 801-03 (emphasis and footnote omitted).  The IDEA does not impose an "absolute" "obligation to assess all areas of suspected disabilities" upon a parent's suspicions, as Plaintiffs suggest. [Opening Br. at 19.]  Rather, the IDEA recognizes that a parent - not only the school district - may voice "informed suspicions" of disabilities that can trigger the school district's responsibility to evaluate the student.  The Ninth Circuit further stated:

> Accordingly, if the DOE decides to administer a non-Chapter 36 test in response to a parental request that is triggered by the parents' concern that the child has disabilities, the parents must be notified of the decision and given the right to challenge it.  Every parental request for an evaluation need not result in the administration of a Chapter 36 evaluation, or any evaluation at all.  But the IDEA encourages parental participation in educational decisionmaking. And it would frustrate that purpose if school districts were not required to respond to parental suspicions of disability, and to provide some mechanism whereby parents may challenge DOE determinations.
>
> We hold that when a parent requests an evaluation because he or she suspects that his or her child may be disabled, the parent must be notified of the DOE's response and how to challenge it. . . .

Id. at 803.

In the present case, Plaintiffs claim that Renee T. repeatedly voiced her concerns regarding J.T.'s possible mental health and communication disorders, but to no avail.  Plaintiffs claim that the IEP team disregarded her concerns because J.T.'s

teachers did not notice any problems in the educational setting.
As the Pasatiempo court stated, the IDEA encourages parental
concerns regarding suspected disabilities.  Renee T. testified
that she would inform the IEP team of her concerns based on her
observations of J.T. at home, yet the IEP team did not
incorporate these concerns into the IEP or offer to conduct any
evaluations of J.T. until the combined June 2010 IEP, after
Renee T. had informed the DOE that she was withdrawing J.T. from
public school.  [Decision at 54.]  The DOE should have evaluated
J.T. for suspected mental health and communication disabilities
when advised of Renee T.'s concerns, or at least clearly denied
her requests and given her the opportunity to challenge the
decision.

        Similarly, it was improper for both the IEP team and
the Hearings Officer to discount the Murphy-Hazzard Report and
its conclusions and recommendations.  Plaintiffs provided
evidence that, even when presented with the Murphy-Hazzard
Report, the IEP team did not incorporate any of the findings into
J.T.'s IEP, and in fact issued an IEP that was substantively
identical to a previous IEP.  [Pet.'s Exh. 5 at 55; Pet.'s Exh. 4
at 47.]  At the administrative hearing, the Hearings Officer
further discounted the Murphy-Hazzard Report by determining that
it was based "one-sidedly" on information provided by Renee T.
[Decision at 51.]  The mental-health and communication issues

raised in the Murphy-Hazzard Report were results of Renee T.'s observations of J.T. outside of the educational setting.  To disregard the Murphy-Hazzard Report on the basis of it relying on Renee T.'s observations is to discount Renee T.'s suspicions and concerns.  As such, the IEP team and Hearings Officer erred in disregarding the findings in the Murphy-Hazzard Report.

## II.  Plaintiffs are not Entitled to Reimbursement for Tuition and Expenses at Loveland Academy

Plaintiffs request that the Court order the DOE to reimburse them for J.T.'s tuition and costs at Loveland Academy and the examination and reports prepared by J.T.'s doctors. Because Plaintiffs have failed to establish that Loveland Academy is an "appropriate" placement, the Court declines to award Plaintiffs the requested reimbursement.

Under 34 C.F.R. § 300.148(c), reimbursement for private school expenditures is available

> [i]f the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate.

59

The Ninth Circuit has reiterated the Supreme Court's two-part test to determine whether tuition reimbursement is warranted:

> In <u>Florence County School District Four v. Carter</u>, 510 U.S. 7, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993), the Supreme Court set minimum criteria that must be met before a guardian may obtain reimbursement for the unilateral placement of a child in a private school.  A parent or guardian is "entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the [IDEA]."  <u>County of San Diego</u>, 93 F.3d at 1466 (citing <u>Carter</u>).  If either criterion is not met, the parent or guardian may not obtain reimbursement.  <u>Id.</u>  If both criteria are satisfied, the district court then must exercise its "broad discretion" and weigh "equitable considerations" to determine whether, and how much, reimbursement is appropriate.  <u>Carter</u>, 510 U.S. at 15-16, 114 S. Ct. 361 (internal quotation marks omitted).

<u>C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.</u>, 635 F.3d 1155, 1159 (9th Cir. 2011).

When determining whether reimbursement is proper, a court "must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted."  <u>Forest Grove Sch. Dist. v. T.A.</u>, 557 U.S. 230, 246 (2009).  The court is also to consider "[t]he conduct of both parties."  <u>Parents of Student W. v. Puyallup Sch. Dist., No. 3,</u>

31 F.3d 1489, 1496 (9th Cir. 1994) (citations omitted).
Reimbursement may be "warranted even though the private school 'fail[ed] to meet state education standards.'" <u>Carter</u>, 510 U.S. at 14.

        In <u>C.B.</u>, the Ninth Circuit affirmed a district court's award of reimbursement for an autistic child's placement at a private school because the school met many of the child's educational needs and provided "significant educational benefits." 635 F.3d at 1158-60. The IEP prepared by the school district had identified a number of the child's unique needs. <u>Id.</u> at 1159. The parent did not dispute those needs, but took issue with the services the school district proposed to provide. <u>Id.</u> Notably, while the private school did not meet all of the child's needs, the child showed "'significant growth' in many learning areas and social development." <u>Id.</u> at 1158.

        By contrast, J.T. has not shown significant growth at Loveland Academy, and, indeed, has regressed in a number of areas. The evidence presented at the administrative hearing showed that J.T. exhibited a number of behavioral problems at Loveland Academy that were not present in his public-school setting. [Hrg. Trans. Vol. III at 379-85, 416-21.] J.T.'s special-education teachers testified that J.T. did not suffer from his current behavioral problems when he was at public school. Moreover, the Hearings Officer determined that Loveland

61

Academy "definitely underestimated Student's academic capabilities and . . . contributed to Student's behaviors of concern at" Loveland Academy. [Decision at 55-56; Pet.'s Exh. 16 at 231.] The Court concludes that Plaintiffs failed to show that the program at Loveland Academy is designed to meet J.T.'s needs.

In considering "all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child," Forest Grove Sch. Dist., 557 U.S. at 246, the Court notes that Plaintiffs refused the DOE an opportunity to evaluate J.T. The Hearings Officer found that Renee T. failed to cooperate with the DOE when it asked to evaluate J.T. in 2010, claiming that she wanted to wait until Loveland Academy finished its assessment. [Decision at 63.] The DOE was not allowed an opportunity to assess J.T. and has not been able to make its own determination as to J.T.'s mental-health and communication needs. This Court cannot say that the equities weigh in favor of rewarding Plaintiffs for their failure to cooperate with the DOE's evaluation of J.T. See Forest Grove Sch. Dist., 638 F.3d at 1239 (requiring that the district court weigh the equitable factors in determining whether to award reimbursement). The Court concludes that Loveland Academy is not an "appropriate" placement and denies tuition reimbursement.[3]

_____

[3] Similarly, the Court denies Plaintiffs' request for costs associated with the evaluations and reports by Dr. Murphy-Hazzard
(continued...)

Even if Loveland Academy were an appropriate placement for J.T., the claim for reimbursement is barred by the 180-day statute of limitations found in Hawai'i Revised Statutes § 302A-443(a)(2).  That statute provides:

> (a) An impartial hearing may be requested by any parent or guardian of a child with a disability, or by the department, on any matter relating to the identification, evaluation, program, or placement of a child with a disability; provided that the hearing is requested:
>
>> (1) Within two years of the date the parent, guardian, or department knew or should have known about the alleged action that formed the basis of the request for a hearing; and
>>
>> (2) Notwithstanding paragraph (1), within one hundred and eighty calendar days of a unilateral special education placement, where the request is for reimbursement of the costs of the placement.

Haw. Rev. Stat. § 302A-443(a).

Although "placement" is not defined by the statute, it is undisputed that Plaintiffs informed the DOE of J.T.'s withdrawal from public school on May 26, 2010 [Pet.'s Exh. 10], J.T. began attending Loveland Academy for assessment beginning in July 2010, and he officially enrolled there on November 10, 2010

---

(...continued)
and Dr. Tyson.  Dr. Tyson's evaluation came after J.T. was enrolled at Loveland Academy and without Plaintiffs requesting an IEE.  See 34 C.F.R. § 300.502.  Moreover, neither request was substantively supported in Plaintiffs' Opening Brief.

[Pet.'s Exh. 22 at 276; Hrg. Trans. Vol. III at 331:12-13].
Plaintiffs urge the Court to find that J.T.'s "placement"
occurred on his official enrollment date, rather than when he
began attending the school.  [Opening Br. at 33-35.]

          The Court concludes that J.T.'s unilateral educational
placement for the purposes of Hawai'i Revised Statutes § 302A-
443(a) occurred in July 2010, when he first began attending
Loveland Academy.  The DOE presented substantial evidence at the
administrative hearing that J.T. was receiving educational
services, speech-language services, and occupational-therapy
services akin to a regular student from July 2010.  [Hrg. Trans.
Vol. I at 22-34, 54-56, 201-03.]  The Hearings Officer found that
J.T. was "defacto placed at Current Placement about three months
before being officially enrolled because Student was fully
involved in an educational setting and receiving the same
educational services as other students and that Mother certainly
considered Student's pre-enrollment time at Current Placement as
satisfying her obligations under Hawaii's compulsory education
law . . . ."  [Decision at 57 n.7.]  This Court agrees.
Plaintiffs cannot skirt the 180-day statute of limitations by
simply arguing that J.T. was not "placed" at Loveland Academy
until his official enrollment three months after initially
receiving comprehensive services there.  Renee T. informed the
DOE that she was withdrawing J.T. from public school and placing

64

him at Loveland Academy and subsequently did so in July 2010.
The 180-day statute of limitations begins running from that time.

Nor is the Court persuaded by Plaintiffs' argument that
the DOE acknowledged J.T.'s withdrawal from public school as of
September 28, 2010.  [Opening Br. at 34-35.]  As the DOE pointed
out, the correspondence concerned J.T.'s absence from public
school and possible truancy, not withdrawal and enrollment dates
for IDEA purposes.  [Answering Br. at 31 n.11.]  Accordingly, the
Court DENIES Plaintiffs' request for reimbursement.

III. **Compensatory Education**

Plaintiffs request that the Court award J.T. two years
of compensatory education at Loveland Academy, arguing that the
Hearings Officer's award of one-year compensatory education
contingent upon an evaluation is too vague and indeterminate.
[Opening Br. at 36-37.]  The Court DENIES Plaintiffs' requested
relief and instead ORDERS an evaluation of J.T. to determine
whether and to what extent an award of compensatory education is
appropriate.

"[C]ompensatory education involves discretionary,
prospective, injunctive relief crafted by a court to remedy what
might be termed an educational deficit created by an educational
agency's failure over a given period of time to provide FAPE to a
student." Department of Educ. v. Zachary B. ex rel. Jennifer B.,
Civ. No. 08-00499 JMS/LEK, 2009 WL 1585816, at *9 (D. Hawai'i

June 5, 2009).  The Ninth Circuit has explained that:

> Compensatory education services can be
> awarded as appropriate equitable relief.  20
> U.S.C. § 1415(i)(2)(B)(iii) ("shall grant
> such relief as the court determines
> appropriate"); Parents of Student W. v.
> Puyallup Sch. Dist., 31 F.3d 1489, 1496–97
> (9th Cir. 1994).  Appropriate relief is
> relief designed to ensure that the student is
> appropriately educated within the meaning of
> the [Individuals with Disabilities Education
> Act].  The courts have discretion on how to
> craft the relief and "[t]here is no
> obligation to provide a day-for-day
> compensation for time missed."  We review the
> Hearing Officer's and the district court's
> award of compensatory education services for
> abuse of discretion.

Park ex rel. Park v. Anaheim Union High Sch. Dist., 464 F.3d

1025, 1033 (9th Cir. 2006) (some citations and quotation marks

omitted).

The Hearings Officer awarded Plaintiffs a year of

speech-language services contingent on an evaluation of J.T.

finding such services necessary.  The Hearings Officer reasoned:

> This situation presents a dilemma when
> considering the equities in deciding the
> compensatory education issue as it relates to
> speech-language services.  The DOE failed to
> set in motion the evaluation process in 2009
> but when it did so in 2010 that evaluation
> process was thwarted by Petitioners.
> Nevertheless, Student should not be the
> "loser" if a proper full assessment leads to
> the conclusion that he should receive speech-
> language services on account of mixed
> receptive-expressive disorder and/or an
> auditory processing disorder.

> The Hearings Officer concludes that this
> dilemma should be resolved as follows: If a

66

> future full assessment of Student results in
> a finding that he has one [or] both of these
> disorders, Student should receive the
> equivalent of an additional year of speech-
> language services appropriate to Student's
> situation at the time of such a finding or
> findings.

[Decision at 63.]  The Hearings Officer declined to award

compensatory education for mental-health services, concluding

that, because there was no procedural or substantive denial of

FAPE regarding mental-health issues, compensatory education was

not appropriate.  [Id. at 62.]

  The Court agrees with the Hearings Officer, insofar as

he determined that an award of compensatory education was the

best way to compensate J.T. for the procedural denial of FAPE.

The Court recognizes the difficulty faced by the Hearings

Officer: on the one hand, J.T. was procedurally denied a FAPE; on

the other hand, there has been no determination as to the extent

of injury, if any, that he suffered as a result of that denial of

a FAPE.  The record is devoid of sufficient facts with which this

Court could craft an appropriate award of compensatory education.

  Given these circumstances, the Court determines that an

award of compensatory education is the most equitable way in

which to compensate J.T. for the possible loss of educational

opportunity.  The Court realizes that a lengthy, protracted

litigation only compounds the denial of a FAPE and any possible

injury J.T. may be suffering.  The Court ORDERS as follows:

67

(1) within 14 days of the date of this order, the
parties are to meet and confer as to a neutral, appropriate
evaluation of J.T. concerning both his mental health and
communication needs and agree who will evaluate J.T. and when the
evaluation will take place;

(2) the parties will submit the results of the
evaluation to the Hearings Officer, no later than 7 days after
receipt of the results, along with any briefing the Hearings
Officer may require or allow, in accordance with a briefing
schedule issued by the Hearings Officer;

(3) the Hearings Officer will issue his decision
regarding an appropriate award of compensatory education within a
reasonable time thereafter, or in accordance with any such
schedule that the parties and the Hearings Officer may agree
upon, not to exceed six months; and

(4) the parties will equally split the cost of the
evaluation and will each bear their own attorneys' fees and costs
in this process.

Accordingly, it is the Court's hope that, through a
collaborative process, an award of compensatory education
tailored to remedy any injury that J.T. may have suffered as a
result of the denial of a FAPE will appropriately restore J.T. to
the position he would have been in had there not been a
procedural violation of the IDEA.

68

IV.  **Attorneys' Fees**

In considering an IDEA appeal, the district court has discretion to grant attorneys' fees and costs to the prevailing party.  The IDEA provides:

> (B) Award of attorneys' fees
>
> > (i) In general
> >
> > In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs—
> >
> > > (I) to a prevailing party who is the parent of a child with a disability;

20 U.S.C. § 1415(i)(3)(B).

Under the IDEA, a "prevailing party" is one who succeeds in achieving a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute."  Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792-93 (1989).  However, "a plaintiff is not the prevailing party if his or her success is purely technical or de minimis."  Shapiro ex rel. Shapiro v. Paradise Valley Unified School Dist. No. 69, 374 F.3d 857, 865 (9th Cir. 2004) (the district court did not abuse its discretion in determining that parents were "prevailing parties" for IDEA purposes, where they prevailed on several significant aspects of their claim and were awarded money damages).

69

In the present action, Plaintiffs meet the prevailing-party threshold.  The Hearings Officer determined that J.T. was denied a FAPE due to the DOE's exclusion of Renee T. from the May 29, 2009 IEP meeting, and this Court further determines that J.T. was denied a FAPE due to the DOE's exclusion of Renee T. from the March 3, 2010 IEP meeting and its failure to consider the Murphy-Hazzard Report and Renee T.'s concerns.  Plaintiffs' success is not purely technical or de minimis, because this obligation materially alters the legal relationship between the parties.  Accordingly, the Court awards Plaintiffs reasonable attorneys' fees and costs associated with the administrative hearing and the present appeal.  The Court refers this matter to the magistrate judge to prepare findings and recommendations regarding the amount of the award.

## <u>CONCLUSION</u>

On the basis of the foregoing, the Administrative Hearings Officer's Findings of Fact, Conclusions of Law and Decision, filed September 12, 2011, is HEREBY PARTIALLY REVERSED and REMANDED for further determinations by the Hearings Officer not inconsistent with this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, May 31, 2012.



  /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**J.T., ETC., ET AL. V. DEPARTMENT OF EDUCATION, ETC; CIVIL 11-00612 LEK-BMK; ORDER REVERSING IN PART AND REMANDING HEARINGS OFFICER'S ORDER DATED SEPTEMBER 12, 2011**