IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| J.T., by and through his parents Renee and Floyd T., | ) ) ) | CIVIL 11-00612 LEK-RLP |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAI`I, | ) ) ) | |
| Defendant. | ) ) ) | |

**ORDER AFFIRMING IN PART AND VACATING IN PART
HEARINGS OFFICER'S ORDER DATED SEPTEMBER 12, 2011**

On August 14, 2017, the Ninth Circuit issued its
memorandum disposition reversing this Court's May 31, 2012 Order
Reversing in Part and Remanding Hearings Officer's Order Dated
September 12, 2011[1] ("5/31/12 Order") and remanding the case for
further proceedings ("Memorandum Disposition"). [Dkt. no. 27,
116.[2]] On October 9, 2017, Plaintiffs J.T. ("Student"), by and

_____

[1] The Administrative Hearings Officer's ("Hearings Officer")
September 12, 2011 Findings of Fact, Conclusions of Law and
Decision ("9/12/11 Decision"), including its Legend, is in the
Administrative Record on Appeal, transmitted on December 16, 2011
("AR"), at 382-446.

[2] The 5/31/12 Order is also available at 2012 WL 1995274,
and the Ninth Circuit's Memorandum Disposition is also available
at 695 F. App'x 227.

The parties participated in administrative proceedings on
remand from this Court following the 5/31/12 Order. The Hearings
Officer issued the Findings of Fact, Conclusions of Law and
Decision After Remand on June 7, 2013 ("6/7/13 Decision") and the
Supplemental Findings of Fact, Conclusions of Law, and
(continued...)

through his parents Renee and Floyd T. (collectively

"Plaintiffs"),[3] filed their Opening Brief on Remand ("Opening

Brief"). [Dkt. no. 125.] Defendant Department of Education,

State of Hawai`i ("Defendant" or "the DOE") filed its Answering

Brief on November 13, 2017, and Plaintiffs filed their Reply

Brief on Remand ("Reply Brief") on November 27, 2017. [Dkt.

nos. 127, 128.] This matter came on for oral argument on hearing

on December 11, 2017. On January 12, 2018, Plaintiffs and

Defendants filed their respective supplemental documents. [Dkt.

nos. 132, 133.] The 9/12/11 Decision is hereby affirmed in part

and vacated in part for the reasons set forth below.

Specifically, this Court concludes that: Student was denied a

Free Appropriate Public Education ("FAPE"); his placement at

Loveland Academy ("Loveland") was appropriate; and a partial

reimbursement award is warranted under the circumstances of this

---

[2] (...continued)
Supplemental Decision After Remand on September 26, 2013
("9/26/13 Decision"). On March 24, 2014, this Court issued an
order affirming in part the 6/7/13 Decision and the 9/26/13
Decision and reversing and remanding them in part ("3/24/14
Order"). [Dkt. no. 87, *available at* 2014 WL 1213911.] However,
after the parties' stipulation rendered a remand unnecessary,
final judgment was entered on May 15, 2014. [Dkt. nos. 92, 93.]
The appeal to the Ninth Circuit followed. In light of its
holdings regarding the 5/31/12 Order, the Ninth Circuit also
vacated the 3/24/14 Order. 695 F. App'x at 228. The specific
legal issues addressed in the 3/24/14 Order are not relevant to
the issues addressed in this Order.

[3] Renee T. will be referred to as "Mother" and Renee T. and
Floyd T. will be referred to collectively as "Parents."

case.  Defendant is ordered to reimburse Plaintiffs $61,137.47

under 20 U.S.C. § 1412(a)(10)(C)(ii) and $12,187.61 under 20

U.S.C. § 1415(i)(2)(C)(iii), for a total award of $73,325.08.

## BACKGROUND

The factual and administrative background of this case,

culminating in the 9/12/11 Decision, is set forth in the 5/31/12

Order, and only the background relevant to the issues in the

Ninth Circuit's remand will be reiterated in this Order.[4]  In the

5/31/12 Order, this Court:

- affirmed the Hearings Officer's ruling that the DOE denied Student a FAPE, as required under the Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. § 1400, *et seq.*, by excluding Mother from the May 29, 2009 Individualized Education Program ("IEP") team meeting; 2012 WL 1995274, at *22;

- reversed the Hearings Officer's ruling that the DOE's failure to include Mother in the March 3, 2010 IEP team meeting was not a denial of FAPE; id. at *23-24; and

- concluded the DOE denied Student a FAPE by disregarding Mother's concerns based on observations of Student outside of school and by disregarding a neuropsychological evaluation by Peggy Murphy-Hazzard, Psy.D., dated

---

[4] The Ninth Circuit held that this Court: erred in concluding Plaintiffs' due process hearing request seeking tuition reimbursement was untimely; and abused its discretion in denying tuition reimbursement for Student's placement at Loveland because the 5/31/12 Order collapsed the proper placement inquiry into the analysis of whether reimbursement was warranted.  695 F. App'x at 228.  The Ninth Circuit did not hold that any of this Court's factual findings were clearly erroneous.

February 25, 2009 (the "Murphy-Hazzard Report"),[5] <u>id.</u> at
*24-26.

The Ninth Circuit's Memorandum Disposition did not disturb these
rulings.  Following the remand from the Ninth Circuit, the issues
before this Court are: 1) "whether [Student] has demonstrated
that Loveland was a 'proper placement'"; and 2) whether, in this
Court's "'broad discretion[]' to consider 'all relevant factors,'
. . . reimbursement is appropriate."  695 F. App'x at 228.
Plaintiffs seek reimbursement of: $244,549.86 under 20 U.S.C.
§ 1412(a)(10)(C)(ii) for Loveland tuition incurred during the
period from November 10, 2010 to July 31, 2012; and $48,750.42
under 20 U.S.C. § 1415(i)(2)(C)(iii) for the cost of Loveland's
assessment and preparation of his education plan incurred during
the period from July 6, 2010 to November 10, 2010 ("Diagnostic
Period").  [Opening Brief at 17-18.]

## DISCUSSION

I.  **Whether Loveland was a Proper Placement**

        In the Memorandum Disposition, the Ninth Circuit
stated:

        A placement is proper if it is "specially designed
        to meet the unique needs of a handicapped child,

_____

        [5] The Murphy-Hazzard Report, [Pets.' Exh. 9, AR at 86-97,]
concluded that Student "had below-average to borderline verbal
cognitive abilities, the possibility of an auditory processing
disturbance, a basis for diagnosing attention deficit
hyperactivity disorder (ADHD), and a basis for diagnosing a
mixed, receptive-expressive language disorder."  5/31/12 Order,
2012 WL 1995274, at *1.

> supported by such services as are necessary to
> permit the child to benefit from instruction."
> C.B. ex rel. Baquerizo v. Garden Grove Unified
> Sch. Dist., 635 F.3d 1155, 1159 (9th Cir.
> 2011). . . .
>
>     . . . .
>
>     At the "proper placement" stage, the district
> court need only consider whether, at the time of
> enrollment, the unilateral placement was
> "reasonably calculated" to meet the student's
> needs. [Adams v. Oregon, 195 F.3d 1141, 1149 (9th
> Cir. 1999).] For this inquiry, relying on
> hindsight is inappropriate. See id. . . .

Id.

Student officially enrolled at Loveland in November

2010. Mem. Dispo., 695 F. App'x at 228. At the May 17, 2011

administrative hearing, John Loveland, Loveland's clinical

director, described Loveland as "a day treatment center for

mental health" that "is accredited by the Commission on

Accreditation of Rehabilitation Facilities (CARF)" and the

National Independent Private School Association. [9/12/11

Decision at 32-33 (AR at 413-14).] At the time of the hearing,

Loveland and "maybe only two other facilities on Oahu" had CARF

accreditation. [Id. at 32 (AR at 413).] The Hearings Officer

found that Loveland's academic classes are based on DOE

standards, and Loveland students can transfer their academic

credits to a DOE school to obtain a diploma. [Id. at 33 (AR at

414).]

On May 26, 2010, Mother informed the DOE that she was considering placing Student at Loveland. [Pets.' Exh. 10 (various correspondence), AR at 140 (handwritten letter stating, "Parent will place [Student] at Loveland Academy at state expense or she will be put in a position to file administrative due process hearing.").[6]] Prior to that point, Mother attempted to inform Student's IEP team of her concerns based on her observations of Student at home, but the IEP team neither incorporated her concerns into Student's IEPs nor offered to conduct evaluations of Student until the IEP that was developed after meetings on May 26, 2010 and June 22, 2010 ("combined June 2010 IEP"),[7] *i.e.* after Mother informed the DOE that she was considering placing Student at Loveland. Id. Further, although Mother provided the IEP team with a copy of the Murphy-Hazzard Report in March or April 2009, id. at *2, the IEP team discounted the report and failed to address the mental-health and

_____

[6] A friend who attended the May 26, 2010 IEP team meeting handed Mother's letter to Kalei`opu`u staff before Mother left the meeting. [Pets.' Exh. 10, AR at 139 (letter dated 5/28/10 from the Kalei`opu`u principal to Mother regarding Mother's letter).] Although the May 26, 2010 letter indicated Mother was considering placing Student at Loveland, and the record shows Student began the Diagnostic Period at Loveland on July 6, 2010, Mother did not provide Kalei`opu`u with written notice of Student's placement at Loveland until September 27, 2010. See Pets.' Exh. 9, AR at 115 (letter dated 9/27/10 to the Kalei`opu`u principal from Mother).

[7] As noted, *supra*, Mother attended the IEP team meeting on May 26, 2010. She also attended the June 22, 2010 meeting. 5/31/12 Order, 2012 WL 1995274, at *3.

communication issues raised in the report.  Id. at *26.  Prior to

Student's official enrollment, Loveland performed a Mental Health

Assessment and a Speech Language Therapy Assessment.  [Pets.'

Exh. 18, AR at 247-65 (Mental Health Assessment

July/August/September 2010); Pets.' Exh. 27, AR at 330-52 (Speech

Language Therapy Assessment, dated 9/5/10).]  Thus, Loveland

assessed Student in the areas of concern the DOE failed to

address while Student was attending Kalei`opu`u Elementary School

("Kalei`opu`u").

      Loveland had a Transdisciplinary Team Treatment Plan

("Transdisciplinary Plan"), a Functional Behavior Assessment and

Behavior Support Plan ("FBA/BSP"), and an Individualized Day

Treatment Academic Program ("Academic Program") for Student.

[Pets.' Exh. 15 (Transdisciplinary Plan), AR at 208-29; Pets.'

Exh. 17 (FBA/BSP), AR at 232-46; Pets.' Exh. 22 (Academic

Program), AR at 275-95.]  However, all of these were either

prepared or revised in April 2011, i.e. after Student had been

officially enrolled at Loveland for several months.  The

administrative record does not contain the versions of these

documents that were in existence at the time at the time of

Student's enrollment, which is the relevant point for the proper

placement issue.  However, the Hearings Officer found

Transdisciplinary Plan had "mental health goals based on

discussions at treatment team meetings, discussion with Parents,

and individual discussions with staff," and these goals were "designed to address the mental health deficits **observed during the diagnostic period** and the red flags observed or reported by others." [9/12/11 Decision at 39 (AR at 420) (emphasis added).] Although the lack of records showing the plans and programs in place on the date of Student's official enrollment is concerning, it can be reasonably inferred that the results of the mental-health and speech-language assessments Loveland conducted prior to Student's enrollment were incorporated into plans and programs that were in place at the time of his enrollment.[8]

This Court concludes that, at the time of Student's official enrollment at Loveland, the unilateral placement was "reasonably calculated" to meet Student's needs. See Adams, 195 F.3d at 1149. Thus, Loveland was a proper placement for Student at the time of his official enrollment in November 2010.

## II. Whether Reimbursement is Appropriate

Because of the DOE's violations of the IDEA while Student was attending Kalei`opu`u, and because Loveland was a proper placement for Student, Plaintiffs have met the minimum requirements to obtain reimbursement for their unilateral

---

[8] This Court emphasizes the inference is reasonable under the facts and circumstance of the present case. This Court expresses no opinion as to whether a similar inference could be made in other cases. Arguably, the better practice is to preserve a record of the plans and programs in place at the time of a student's enrollment at a private placement.

placement of Student at Loveland.  See C.B., 635 F.3d at 1159.

This Court must now "exercise its 'broad discretion' and weigh

'equitable considerations' to determine whether, and how much,

reimbursement is appropriate."  See id. (quoting Florence Cty.

Sch. Dist. Four v. Carter, 510 U.S. 7, 15-16, 114 S. Ct. 361

(1993)).

The United States Supreme Court has stated:

> When a court or hearing officer concludes
> that a school district failed to provide a FAPE
> and the private placement was suitable, it must
> consider **all relevant factors**, including the
> notice provided by the parents and the school
> district's opportunities for evaluating the child,
> in determining whether reimbursement for some or
> all of the cost of the child's private education
> is warranted. . . .

Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009)

(emphasis added).  Plaintiffs emphasize Forest Grove involved a

§ 1415(i)(2)(C)(iii) request for reimbursement, while Plaintiffs

seek reimbursement both under § 1415(i)(2)(C)(iii) and under

§ 1412(a)(10)(C)(ii).  Plaintiffs argue that, in reviewing their

§ 1412(a)(10)(C)(ii) reimbursement request, this Court is limited

to considering the factors listed in § 1412(a)(10)(C)(iii), which

states:

> The cost of reimbursement described in clause (ii)
> may be reduced or denied–
>
> (I)  if–
>
> (aa) at the most recent IEP meeting that
> the parents attended prior to removal of
> the child from the public school, the

parents did not inform the IEP Team that
they were rejecting the placement
proposed by the public agency to provide
a free appropriate public education to
their child, including stating their
concerns and their intent to enroll
their child in a private school at
public expense; or

(bb) 10 business days (including any
holidays that occur on a business day)
prior to the removal of the child from
the public school, the parents did not
give written notice to the public agency
of the information described in item
(aa);

(II) if, prior to the parents' removal of the
child from the public school, the public
agency informed the parents, through the
notice requirements described in section
1415(b)(3) of this title, of its intent to
evaluate the child (including a statement of
the purpose of the evaluation that was
appropriate and reasonable), but the parents
did not make the child available for such
evaluation; or

(III) upon a judicial finding of
unreasonableness with respect to actions
taken by the parents.

Plaintiffs' argument is rejected because nothing in <u>Forest Grove</u>

limits the consideration of "all relevant factors" to cases

involving § 1415(i)(2)(C)(iii) reimbursement requests.  Further,

the Ninth Circuit remanded the instant case for this Court "to

consider 'all relevant factors,' when determining if

reimbursement is appropriate."  Mem. Dispo., 695 F. App'x at 228

(quoting <u>Forest Grove</u>, 557 U.S. at 247, 129 S. Ct. 2484).  This

Court will therefore consider "all relevant factors" in

10

considering both Plaintiffs' § 1415(i)(2)(C)(iii) request for

reimbursement and their § 1412(a)(10)(C)(ii) request.[9]

The Ninth Circuit has recognized that the following are

among "all relevant factors in determining whether to grant

reimbursement and the amount of the reimbursement": notice

provided to the school district prior to unilateral private

placement; "the existence of other, more suitable placements[;]

the effort expended by the parent[s] in securing alternative

placements"; "the general cooperative or uncooperative position

of the school district"; and whether the student's parents chose

the private placement for reasons unrelated to the student's

disabilities. <u>Forest Grove Sch. Dist. v. T.A.</u>, 523 F.3d 1078,

1088-89 (9th Cir. 2008) ("<u>Forest Grove I</u>") (some alterations in

---

[9] In addition to this analysis of the case law, the facts of
this case do not support the application of a different standard
to Plaintiffs' § 1415(i)(2)(C)(iii) request for reimbursement and
their § 1412(a)(10)(C)(ii) request.  The Hearings Officer noted
that, during the Diagnostic Period, "Student was physically
present at [Loveland] five days a week, participated in the
[biopsychosocial rehabilitation program ("BPSR")] program and the
Mauka to Makai program in the afternoon, received educational
services, received speech-language services, received
occupational therapy services, and received academic services."
[9/12/11 Decision at 35 (AR at 416).]  Further, Loveland billed
between $11,194.40 and $11,459.15 during the Diagnostic Period
(July to October 2010) and between $11,379.89 and approximately
$11,900.00 for July to October 2011, when Student was officially
enrolled at Loveland.  [Administrative Record on Appeal (after
remand) ("ARR"), filed 8/14/13 (dkt. no. 59), at 70.]  Thus, the
"diagnostic" services rendered during that period appear to have
been, at a minimum, very similar to the services Student received
after Student was officially enrolled at Loveland.

Forest Grove I) (some citations and quotation marks omitted).[10]
Further, "a student's lack of progress is an equitable
consideration the district court has discretion to weigh."  Mem.
Dispo., 695 F. App'x at 228.

A.  **Supplemental Evidence**

Because the administrative record only contained
materials relevant to Student's progress until May 2011, this
Court granted Plaintiffs' request for leave to supplement the
record, pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii),[11] and ordered
both parties to submit supplemental documents.  [EO: Court Order
to Supplement the Record, filed 12/14/17 (dkt. no. 131)
("12/14/17 EO").]  The 12/14/17 EO stated:

> this Court will consider documents prepared during
> – or within a reasonable time after – Student's
> attendance at Loveland ("Supplemental Documents").
> Examples of the Supplemental Documents include
> report cards or other evaluations/assessments by
> Loveland, as well as reports prepared by Defendant
> based on its evaluations of Student conducted
> while he was attending Loveland.  This Court finds
> that the Supplemental Documents constitute

---

[10] In Forest Grove, 557 U.S. 230, the Supreme Court affirmed
Forest Grove I.

[11] In a civil action appealing the decision in an IDEA
administrative proceeding, the court "shall hear additional
evidence at the request of a party."  § 1415(i)(2)(C)(ii).  Such
"'additional evidence' includes, inter alia, evidence concerning
relevant events occurring subsequent to the administrative
hearing," but does not include "evidence that changes the
character of the hearing from one of review to a trial de novo."
E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of
Admin. Hearings, 652 F.3d 999, 1004 (9th Cir. 2011) (citations
and some internal quotation marks omitted).

> "additional evidence" for purposes of
> § 1415(i)(2)(C)(ii).  Testimony about the
> Supplemental Documents and testimony about
> Student's progress at Loveland will not be
> considered because it would change the character
> of the instant appeal to a trial *de novo*.

[Id. at 2.]

Plaintiffs' counsel stated, "[h]ard copies of progress notes and assessments prepared during the Relevant Period[12] cannot be found," apparently either by Parents or Loveland. [Decl. of John P. Dellera Authenticating Suppl. Exhs. ("Dellera Decl."), filed 1/12/18 (dkt. no. 132), at ¶ 2.]  Plaintiffs therefore submitted "PDF copies of Microsoft Word digital files sent to [Plaintiffs' counsel] by Loveland."  [Id.]  The metadata for the digital files indicates when each file was created and when it was last revised and/or saved.  [Id. at ¶ 4, Exh. C (chart prepared by counsel showing metadata information for each digital file).]

To clarify, the "relevant period" addressed in the Supplemental Documents is the period after May 2011 until the end of July 2012, *i.e.*, the period when Student was enrolled at Loveland but Plaintiffs did not have the opportunity to present evidence about at the May 17, 2011 administrative hearing.  In order for a document to be reliable evidence addressing the

---

[12] What Plaintiffs' counsel refers to as the "Relevant Period" is the period "which ends a reasonable time after July 31, 2012 when [Student]'s attendance at Loveland ended." [Dellera Decl. at ¶ 1.]

relevant period, it had to have been prepared and/or revised **at the time of the events addressed in the document, or within a reasonable time after those events**. Plaintiffs' position that all documents created and/or revised anytime during Student's attendance at Loveland, regardless of when the subject events occurred, is rejected.

This Court finds that a reasonable period of time after the subject events is two months after a document was created. Thus, this Court will **not** consider any document that was created and/or revised more than two months after the events addressed in the document. The following documents therefore constitute "Supplemental Documents," as described in the 12/14/17 EO, and will be considered by this Court: Student's Progress Notes from May 2011 to September 2011; [Dellera Decl., Exh. A at 1-29;] Student's Progress Notes from December 2011; [id. at 41-45;] and Student's Present Levels of Performance ("PLEP") and Present Levels of Function ("PLEF") for May 2012, [Dellera Decl., Exh. B at 1-10].[13]   The following documents do **not** constitute

_____

[13] The PLEP and PLEF included within Plaintiffs' Exhibit B appear to be same as those included within Defendant's Exhibit K, which is a Fax Transmittal, erroneously dated March 9, 2012, from Loveland to Kalei`opu`u, transmitting progress and status reports, in response to a May 10, 2012 letter to Loveland from Kalei`opu`u.  [Def.'s List of Suppl. Documents Pursuant to Court Order to Supplement the Record [Dkt. No. 131], filed 1/12/18 (dkt. no. 133), Decl. of Kevin M. Richardson ("Richardson Decl."), Exh. K.]  The May 10, 2012 letter to Loveland from
(continued...)

"Supplemental Documents" and will not be considered: Progress

Notes from October 2011 and November 2011; [Dellera Decl., Exh. A

at 30-40 Progress Notes from January 2012 to May 2012;[14] and

Student's Discharge Summary, [id. at 11-15].

Defendant submitted evaluations, assessments, and

reports prepared by DOE personnel while Student was attending

Loveland, as well as Kaleiopuu's correspondence with Mother and

Loveland regarding progress information. [Richardson Decl.,

Exhs. A-M.] Defendant's Exhibits A-M are "Supplemental

Documents," as defined in the 12/14/17 EO, and will be considered

by this Court. Defendant's Exhibits N and O are **not** within the

definition of "Supplemental Documents" and will not be

considered.

B.    **The Relevant Factors**

1.    **Factors in Favor of Reimbursement**

At the outset, the Court notes the rulings that Student

was denied a FAPE and that Loveland was a proper placement weigh

heavily in favor of reimbursement, although those factors are not

_____

[13] (...continued)
Kalei`opu`u is Exhibit H to the Richardson Declaration.

[14] Plaintiffs did not submit the January 2012 to May 2012
Progress Notes because counsel acknowledged they could not be
authenticated, even under Plaintiffs' interpretation of the
"Relevant Period," because they "were changed more than six
months after [Student] left Loveland." [Dellera Decl. at ¶ 6.]
The Court has addressed those documents to make clear that it
would not have considered those documents even if Plaintiffs had
submitted them.

always dispositive.  See, e.g., Forest Grove Sch. Dist. v. T.A.,

638 F.3d 1234 (9th Cir. 2011) ("Forest Grove III") (affirming

denial of reimbursement for private school tuition because the

district court's finding that the student's parents enrolled him

at the private school for non-educational reasons was not an

abuse of discretion).[15]  If the DOE had not excluded Mother from

the May 29, 2009 and March 3, 2010 IEP team meetings, and if it

had properly considered the Murphy-Hazzard Report and Mother's

out-of-school observations, Student's IEP may have been

significantly different, and Parents may not have found it

necessary to place Student at Loveland in the first instance.

Further, in this case, there is no indication of the type of

extreme reasons for private placement – unrelated to disabilities

addressed in the IDEA – that supported the denial of

reimbursement in Forrest Grove III.  See 638 F.3d at 1238 ("The

district court held the 'timing of the change in schools is

instructive,' noting that T.A.'s enrollment at [the private

school] followed his descent into increasingly severe drug

addiction, his decision to run away from home, his calls to 1-900

sex lines, and his use of Internet pornography sites, none of

_____

[15] On remand after Forest Grove I and the Supreme Court's
decision, the district court ruled that the equitable
considerations in the case did not warrant reimbursement of
T.A.'s tuition at his private school.  T.A. appealed to the Ninth
Circuit.  See Forest Grove III, 638 F.3d at 1235.

which events were attributable to any IDEA-defined disabilities.").

## 2. <u>**Failure to Cooperate with Assessments**</u>

There are a number of factors that weigh against reimbursement. First, although Mother and the Murphy-Hazzard Report raised concerns about speech and language, Mother failed to cooperate with Kalei`opu`u in the scheduling of a speech-language assessment. Mother's speech and language concerns and the DOE's reevaluation proposal, including speech-language testing, were on the agenda for the June 22, 2010 IEP team meeting. [Pets.' Exh. 10, AR at 150 (attachment to undated letter to Mother from the Kalei`opu`u principal transmitting Conference Notice and Agenda).] Apparently at the June 22, 2010 IEP team meeting, the Kalei`opu`u Student Services Coordinator ("SSC") presented Mother with a DOE Request for Evaluation for speech and language, along with a DOE Consent for Assessment as Part of a Reevaluation form. Mother signed the consent form and dated it July 12, 2010, but the form did not have the date of the Prior Written Notice ("PWN") filled in. [Resp.'s Exh. 9, AR at 73-74.] On June 28, 2010, the Kalei`opu`u vice principal sent Mother a letter with, *inter alia*, the June 28, 2010 PWN regarding reevaluation, and another consent form, with the June 28, 2010 PWN date filled in. [Resp.'s Exh. 13 (various correspondence), AR at 152-57.] Mother signed the new consent form and dated it

17

July 12, 2010 ("Reevaluation Consent").  [Resp.'s Exh. 9, AR at 75.]  On July 20, 2010, Kalei`opu`u acknowledged receipt of the Reevaluation Consent.  [Pets.' Exh. 10, AR at 130.]

In an August 10, 2010 letter to Mother ("8/10/10 Letter"), the Kalei`opu`u principal stated the school had planned to conduct the speech-language assessment during the first week of school, but Mother informed Student's general education teacher that Student would "most likely not be attending Kalei`opu`u."  [Id. at 128.]  The 8/10/10 Letter offered Mother four different dates, with two or more times per day, to choose from for the speech-language assessment.  It also stated the Kalei`opu`u SSC needed to observe Student in a school environment and offered three different dates for the observation.  [Id.] The 8/10/10 Letter informed Mother that the reevaluation process had a sixty-day timeline that would end on September 10, 2010. However, it noted that Mother had the right to withdraw the Reevaluation Consent, if she elected not to proceed with the reevaluation.  [Id. at 129.]

Mother responded to the 8/10/10 Letter with a August 16, 2010 letter to the Kalei`opu`u SSC.  Mother stated that, because she was dealing with her grandmother's death and their family was "going through a lot changes," she was not able to accommodate the school on any of the dates offered.  [Id. at 127.]  Mother stated, "[i]f I can just suggest a few alternate

18

dates, I will do so as soon as possible. In fact, I will do my very best." [Id.] However, Mother apparently did not follow up her August 16, 2010 letter with any suggested dates.

In an August 23, 2010 letter from an administrator to Mother ("8/23/10 Letter"), Kalei`opu`u offered three further dates for the speech-language assessment, and three further dates for the SSC observation. The 8/23/10 Letter stated that, if Student was found to be eligible for speech-language services, an IEP team meeting would be necessary. It also reiterated the September 10, 2010 deadline and that Mother had the right to withdraw the Reevaluation Consent. [Id. at 124-25.]

In an August 26, 2010 letter to the administrator, Mother stated she appreciated the school's understanding about the difficult time her family was going through. Mother also wrote, "[p]lease do not consider this as being nonresponsive to your August 23, 2010 letter. I plan to provide you with a letter tomorrow." [Id. at 123.]

In an August 31, 2010 letter to Mother ("8/31/10 Letter"), the Kalei`opu`u principal noted Mother never submitted the letter she had promised in her August 26, 2010 letter and reiterated the September 10, 2010 deadline. The 8/31/10 Letter offered four new dates for the speech-language assessment and three new dates for the SSC observation, allowing Mother to choose any one-hour block for each session on the suggested days.

19

[Id. at 121-22.]  Noting Mother's failure to choose any of the
dates previously offered and her right to withdraw her
Reevaluation Consent, the 8/31/10 Letter stated, "[i]f this is
not a good time for you to proceed with the reevaluation process,
you might consider withdrawing your consent and we can open a
reevaluation at another time."  [Id. at 121.]

     Mother apparently did not respond to the 8/31/10
Letter.  In a September 8, 2010 letter to Mother ("9/8/10
Letter"), the Kalei`opu`u principal noted Mother's failure to
propose any alternate dates for the assessments.  [Id. at 120.]
The 9/8/10 Letter stated that, if Mother still wished to proceed
with the reevaluation, she was to call the SSC by 3:00 p.m. on
September 10, 2010 to schedule the assessments and eligibility
meeting.  The letter cautioned that Mother's failure to do so
would result in the DOE's withdrawal of the reevaluation.
However, the 9/8/10 Letter also noted Mother could request a new

reevaluation at anytime and a new timeline would begin.[16] [Id.]
Mother apparently did not respond to the 9/8/10 Letter.

In addition to the letters regarding the reevaluation,
Kalei`opu`u sent Parents letters noting Student had not attended
Kalei`opu`u during the 2010-2011 school year and emphasizing
that, under Hawai`i law, school attendance was mandatory.  The
school asked Parents to confirm whether or not Student would be
attending Kalei`opu`u so that, if necessary, the school could
release him from its school list.  [Id. at 126 (letter dated
8/17/10), 119 (letter dated 9/8/10).]  There is no indication in
the record that Parents responded to these letters.  In a
September 17, 2010 letter to Parents ("9/17/10 Attendance
Letter"), the Kalei`opu`u principal noted that, in addition to
the two prior letters, Student's teacher called Parents on
August 6, 2010, and an in-person conversation took place on

---

[16] The Court notes the sixty-day expiration for the
Reevaluation Consent appears to be a school-created deadline
because the IDEA only requires a determination within sixty days
of parental consent to an **initial** evaluation to determine whether
a child is a child with a disability.  See 20 U.S.C.
§ 1414(a)(1)(C)(i)(I).  However, the deadline was clearly
communicated to Mother on multiple occasions, and the 9/8/10
Letter allowed Mother to continue the reevaluation process by
merely contacting Kalei`opu`u on the last day of the sixty-day
period to schedule the assessments and IEP team meeting.
Further, it was clearly communicated to Mother that she could
start a new reevaluation period at anytime, and the record is
clear that Mother decided Student should not participate in any
DOE assessments until after Loveland's assessments were complete.
Thus, even if the school's sixty-day expiration date was not
required under the applicable law, it did not prejudice
Plaintiffs in any way.

September 14, 2010.  [Id. at 118.]  The principal requested a
September 22, 2010 meeting at 10:00 a.m. to discuss Student's
"non attendance and possible educational neglect."  [Id.]

In a September 21, 2010 letter, Mother responded that
she was not available on September 22, 2010 and suggested either
September 27 at 10:00 a.m. or September 28 at 10:00.  [Id. at
117.]  On September 22, 2010, Kalei`opu`u responded, choosing
September 28 at 10:00 a.m.  [Id. at 116.]

However, on September 27, 2010, Mother stated she was
not able to attend the September 28 meeting – which she herself
had requested – because she "was not able to pull [her]self out
of a precommitment."  [Id. at 115.]  She stated, "please accept
this letter to Kalei`opu`u Elementary School submitted on
September 27, 2010, informing you that [Student] is being placed
at Loveland Academy.  He is currently being assessed for
placement and undergoing diagnostic prescriptive teaching."
[Id.]  In a September 30, 2017 letter, the Kalei`opu`u principal
wished Student the best and asked Mother to sign the enclosed
withdrawal/transfer form.  [Id. at 112-14.]

At the May 17, 2011 administrative hearing, Mother
testified she wanted Student to do the Kalei`opu`u testing, but
she "thought [it would be] one more thing yanking him around"
during his testing at Loveland, which also occurred in the same
period as his testing with Karen A. Tyson, Psy.D.  [AR, Hrg.

22

Trans. at 355.[17]] Mother therefore "wanted to wait until after the other assessments were done." [Id.] However, there is no indication in the record that Mother explained her reasoning to Kalei`opu`u at the time it was trying to schedule the assessments.

In this Court's view, Mother's decision to delay the speech-language assessment, SSC observation, and the reevaluation IEP team meeting that would have followed was significant. Had Mother cooperated with Kalei`opu`u, the IEP team may have formulated an IEP that was significantly different than the combined June 2010 IEP, which was the last IEP developed by the DOE before Student enrolled at Loveland. The DOE may have been able to offer Student a FAPE. However, the Court does note that, while the DOE was trying to conduct a speech-language assessment, it never proposed a mental health evaluation/assessment. Student's mental health needs were a major portion of the unaddressed issues raised by the Murphy-Hazzard Report and Mother's out-of-school observations. Thus, while Mother's failure to cooperate was significant, it must be considered in light of the DOE's failure to offer a mental health assessment.

---

[17] The May 17, 2011 administrative hearing transcript consists of multiple volumes, but citation to the volume numbers is not necessary because the volumes are consecutively paginated.

**3. <u>Overly Expansive Services</u>**

In the 3/24/14 Order, this Court stated:

> The Loveland invoices that Plaintiffs
> submitted show that the major component of
> Student's program at Loveland was the Day
> Treatment Program. <u>See, e.g.</u>, [ARR] at 71-82.
> Loveland's clinical director, John Loveland,
> provided a declaration which states, inter alia:
>
>> The intent of this CARF Accredited Day
>> Treatment program is to provide intensive
>> mental health supports so that a client does
>> not continue to decline psychologically and
>> require inpatient psychiatric
>> hospitalization, or to support a client
>> coming out of an inpatient psychiatric
>> hospital program, until s/he is stable enough
>> to return to a less restrictive environment.
>> While many services are provided in a
>> transdisciplinary manner, all contributing
>> treatment programs . . . come under a mental
>> health umbrella, because Loveland Academy is
>> a Community Based Day Mental Health Treatment
>> Center.
>
>> [<u>Id.</u> at 63.] There is no evidence in the record
>> that Student either came out of an inpatient
>> psychiatric hospital program prior to entering
>> Loveland or that Student was in such a severe
>> psychological decline that his attendance at
>> Loveland was necessary to avoid inpatient
>> psychiatric hospitalization. . . .

2014 WL 1213911, at *13 (some alterations in 3/24/14 Order).

Plaintiffs argue this was an erroneous interpretation of

John Loveland's declaration, and the other evidence in the record

shows that Loveland's services are not limited to students who

are at risk of hospitalization. [Opening Brief at 16-17.]

However, John Loveland's declaration – which Plaintiffs presented

it to the Hearings Officer in their Brief Regarding Award of

24

Compensatory Education – speaks for itself.  Even accepting
Plaintiffs' position that Loveland's mental health programs are
not designed for students who are at risk of psychiatric
hospitalization, John Loveland's declaration also clearly states
all services at Loveland are provided "under a mental health
umbrella."  The issue now before this Court is whether it is
equitable to require the DOE to pay for Student's time at a "Day
Mental Health Treatment Center."

The Murphy-Hazzard Report recommended:

1)   Individual therapy to address his problems
     with attention, and to process and cope with
     stress provoking situations.

2)   It would also benefit [Student] to work on
     acquiring skills to build healthy and
     meaningful friendships/relationships and to
     work on self-management skills in a safe
     group setting.

3)   [Student] would benefit by implementing a
     positive behavioral management plan across
     environments.  His plan should include the
     use of positive reinforcements and a
     structured program that will allow him to
     earn rewards for good behavior and such.

4)   The use of a structured discipline plan used
     in the home (such as 1-2-3 Magic).  This will
     help set healthy boundaries for [Student] and
     alleviate negative or difficult to manage
     behaviors that are being exhibited in the
     home.

5)   [Student] should become fluent with the use
     of a keyboard so that when he has to write,
     he can use the computer.  He should be
     provided a computer program that has a
     dictating capacity such as Dragon Dictate.

> 6) Consider acquiring one of the programs that combine reading and dictating such as Read Write Gold or Kurzweil.

[Pets.' Exh. 9, AR at 96-97.] Neither these recommendations nor Dr. Murphy-Hazzard's recommendations for academic and other accommodations suggest Student's mental health needs were so severe as to require a day treatment program. Similarly, Dr. Tyson's report, which is based on evaluations during the Diagnostic Period, does not indicate Student required a day treatment program. See Pets.' Exh. 8, AR at 77-85.

This Court does not deny the fact that Student received some mental health benefits during his attendance at Loveland, but arguably almost any student would benefit from that type of individualized attention to his or her mental health and well-being. Cf. Pets.' Exh. 16, AR at 231 ("The primary reason for his significant growth and development in the areas of emotional control and self-management has been the intense wrap around mental health services provided for him."). This does not necessarily mean every student who is denied a FAPE because of any type of mental health issue is entitled to reimbursement of tuition at a mental health day treatment program like Loveland. Perhaps Kalei`opu`u should have provided Student with wrap-around support, but that does not mean it is equitable to order full reimbursement for Student's enrollment in a day treatment program that provided a wrap around.

In addition, other aspects of Student's program – while undoubtedly enjoyable – were not necessary for him to achieve academic benefits. For example, in May 2011, Student's occupational therapy goal was to "[i]ncrease independence and safety in kitchen activities." [Dellera Decl., Exh. A at 5.] In that class, which he admittedly attended only one time that month, Student "prepared fried green tomatoes and spam musubi," and apparently practiced his knife skills, including "minc[ing] garlic and cut[ting] meat and vegetables." [Id.] Besides cooking, Student's BPSR Program included the "Mauka Makai" program, ceramics, mixed martial arts, and filmmaking. [Pets.' Exh. 22 (Student's Individualized Day Treatment Academic Program School Year 2010-11), AR at 277.] "Mauka Makai includes hiking (mountains, historical, anthropological, cultural, botanical, etc.) and water (swimming, surfing, paddle boarding, dolphin interaction, etc.) activities from 2:00 p.m. to 4:30 p.m." [Id.] This Court does not minimize the DOE's denial of FAPE to Student, but, even in light of the denial of FAPE, it would not be equitable to require the DOE to pay for Student's mixed martial arts lessons and dolphin experiences.

**4.   Grade Level Placement**

At the time of his official enrollment in November 2010, Student was ten years old. See Decision at 1(AR at 382). However, he was placed in the lower elementary classroom because

of Mother's concerns about his mental health difficulties. [Id. at 36 (AR at 417).] According to Loveland's records, Student was moved to the middle school classroom in March 2011 because of "his lack of motivation, work avoidance and inappropriate behavioral outbursts." [Pets.' Exh. 16, AR at 231.] After the move, Student's "participation, motivation and self-esteem . . . increased," and his "overall attitude for learning . . . stabilized and he . . . stepped up to the challenge of work with older peers." [Id.] Plaintiffs argue Loveland's original grade level placement was correct because the DOE had previously over-estimated Student's academic levels and failed to address his mental health difficulties. Even if Plaintiffs are correct that, at the time of his official enrollment, Student was functioning at a grade level consistent with that of younger children, the record is clear that placing him with younger children – as opposed to placing him with the older students and providing additional supports – caused other problems. Ordering full reimbursement under such circumstances would not be equitable. However, this Court does note Student was in a more appropriate class from March 2011 until he left Loveland at the end of July 2012, *i.e.*, for the majority of his time at Loveland.

### 5. **Lack of Progress**

First, this Court is concerned about the lack of contemporaneous evidence of Student's progress at Loveland, such

as report cards or progress reports.  It is unclear whether such documents were generated and distributed by Loveland, but merely not kept by Parents.  Loveland apparently only kept their monthly notes about Student in electronic format, and it is unclear why Loveland would continue to revise them months, even years, after Student stopped attending Loveland.  Plaintiffs' inability to produce contemporaneous documentation, in and of itself, weighs against reimbursement.

The evidence that is available does not persuade the Court that full reimbursement is warranted in this case.  Student performed well academically at Loveland, see, e.g., Dellera Decl., Exh. B at 2-5, but not significantly better than he did at Kalei`opu`u, see 5/31/12 Order, 2012 WL 1995274, at *12-13 (discussing the testimony of Student's teachers at Kalei`opu`u).

In contrast, Student seemed to experience significant behavioral problems at Loveland that were not present at Kalei`opu`u.  Loveland's Incident Report Update ("Incident Report") describes an incident during the period from November 2010 to April 2011 "that stressed [Student] to a point that he acted out aggressively toward a peer.  After his team lost an APE[18] activity, he was triggered by a verbal comment and chased a peer with a blunt object, which resulted in adult

_____

[18] "APE" is adapted physical education.  [Decl. of John Loveland at ¶ 2, § I.5 (ARR at 64).]

intervention." [Pets.' Exh. 16, AR at 230.] The intensive
instructional service consultant ("IISC") who worked with Student
at Loveland described the incident described in the Incident
Report as "scary" and stated the object Student chased the other
student with was a brick.[19] [AR, Hrg. Trans. at 168.] The IISC
"described Student as 'very impulsive' and referred to situations
where Student grabbed sensory equipment that another child uses
and doing things that were inappropriate such as banging on the
table." [Decision at 36 (AR at 417).] She also described
"strange behaviors such as funning and falling, wrapping himself
in an oversized sweatshirt and getting into a fetal position on
the ground." [Id. at 37 (AR at 418).] Student's FBA/BSP, last
revised in April 2011, noted the following behaviors of concern,
or problem behaviors: impulsivity, aggression, withdrawal, and
non-compliance. [Pets.' Exh. 17, AR at 234, 238-41.] It noted
Student "Occasionally" had "True Crises," and stated the first
step of the crisis strategy was: "Use prevention to keep
[Student] safe and use CPI, as needed, to prevent self-injury."
[Id. at 236-37.] His impulsive behavior included playing with
off-limits objects and leaving the room or work site, and his
aggression toward peers included throwing objects. [Id. at 238-
39.]

_____

[19] According to the IISC, only "an incident that requires
the crisis team to come in" is documented in an incident report.
[AR, Hrg. Trans. at 172.]

Plaintiffs' Supplemental Documents also show behavioral issues at Loveland. A May 2011 BPSR progress note stated, "[a]t the end of last month [Student]'s negative behaviors increased which lead to less independence. . . . For the first week client consistently required redirection and discussion of negative behaviors." [Dellera Decl., Exh. A at 6.] An August 2011 mental health progress note stated, "[t]his month [Student] has been having a difficult time following directions in classes, and teachers are asking for a s[k]ills trainer for him at this time. His levels of understanding what is appropriate and not appropriate are questionable to this provider." [Id. at 24.] An August 2011 mental health note by the IISC stated:

> He is requiring extra adult support to stay on task, modify work and prompt him to request help. [Student] will appear to be working and the work is often incorrect. Other support staffs are constantly being pulled away from their assigned clients to assist him in understanding the activity at hand. He will often shut down when he is demonstrating anxious behaviors and is redirected to take a break to process his frustration. At times [Student] requires additional support that is not available. It's recommended that he be provided a skills trainer to assist with his emotional development and academics.

[Id. at 24-25.] In September 2011, the IISC noted Student "has been demonstrating selective listening in classes with one particular instructor. When questioned about following directives he refers to his medication as a reason. Also he does take medication for attention, the pattern of his non-compliance

seems toward the particular instructor and not medication related." [Id. at 28-29.]

Similar behavioral issues were not observed at Kalei`opu`u. Student's Kalei`opu`u language arts resource teacher for the 2008-2009 school year testified she did not observe the type of behavior Loveland noted in the Incident Report and the FBA/BSP. Student did not shut down, hold his emotions in, show a lack of motivation, avoid work, act aggressively toward his peers, or have behavioral outbursts. Further, the only signs of hyperactivity or impulsivity she observed were shouting answers out and blurting out words, but he was not the only student who did those things. In addition, any lack of focus Student experienced was not out of the ordinary. [AR, Hrg. Trans. at 361, 379-82.] She testified Student would sometimes play with objects, but they were things like his pencil or eraser, not objects that were off-limits. Student did not leave the classroom, never threw things, and was not verbally aggressive toward his classmates. [Id. at 383-84.] Student's Kalei`opu`u language arts resource teacher for the 2009-2010 school year gave similar testimony.[20] [Id. at 404, 416-21.]

Plaintiffs argue the Kalei`opu`u teachers' testimony was "impeached" because they were not qualified to deal with

_____

[20] The Hearings Officer referred to each of Student's resource teachers as Student's "SPED Teacher." See, e.g., 9/12/11 Decision at 15, 27 (AR at 396, 408).

mental health issues, lacked sufficient special education training, and disregarded the Murphy-Hazzard Report, as well as Mother's comments at the IEP team meetings. [Opening Brief at 28-29.] However, at the administrative hearing, Defendant's counsel offered both of the Kalei`opu`u resource teachers as experts in "educating special needs students," and Plaintiffs' counsel did not object to either one. [AR, Hrg. Trans. at 361, 404.] The 9/12/11 Decision stated Student's 2008-2009 resource teacher was "qualified, without objection from Petitioners, as an expert in educating special needs students." [9/12/11 Decision at 16 (AR at 397).] It also contained a similar statement regarding Student's 2009-2010 resource teacher. [Id. at 27 (AR at 408).] Further, the Hearings Officer found:

> Student's SPED teachers obviously had the ability to observe Student in a small classroom setting every school day during those two school years. In addition, they were always in contact with Student's regular education teachers and those teachers did not report any behaviors of concern in this area to the SPED teachers. Further, **they were both highly experienced special education teachers who would be expected to be very sensitive to any mental health behaviors**. The Hearings Officer was very impressed with their dedication to their profession and their students that came through in their testimony and **concludes that they were very credible and authoritative witnesses on this subject.**

[Id. at 52 (AR at 433) (emphasis added) (footnote omitted).]

This district court has "recognize[d] the 'general principles of administrative law which give deference to the

33

unique knowledge and experience of state agencies while
recognizing that a[ hearings officer] who receives live testimony
is in the best position to determine issues of credibility.'"
Dep't of Educ. v. Ria L. ex rel. Rita L., Civil No. 14-00034 DKW-
RLP, 2014 WL 7184217, at *6 n.3 (D. Hawai`i Dec. 15, 2014)
(quoting Amanda J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 889
(9th Cir. 2001)). The 9/12/11 Decision is detailed and thorough,
and the evidentiary bases for the Hearings Officer's credibility
determinations are apparent. Cf. id. at *6-7 (remanding the case
to the hearings officer because, "[w]ithout some specific reason
based on actual evidence in the record, and given the critical
importance of the [hearings officer]'s credibility assessment on
her ultimate findings, the Court is left with no ability to
conduct meaningful judicial review of the credibility
determinations"). Plaintiffs have not shown sufficient reasons
why this Court should not give the appropriate deference to the
Hearings Officer's credibility determinations.

Even if this Court accepted Plaintiffs' position that
Loveland's staff was more qualified to recognize mental health
issues than were Student's Kalei`opu`u teachers who testified
before the Hearings Officer, it would not justify rejecting the
testimony of the Kalei`opu`u teachers. This Court agrees that
the Loveland staff's specialized knowledge may have allowed them
to recognize more of Student's withdrawal behaviors, such as

34

shutting down, isolation, and ceasing communication.  <u>See</u> Pets.
Exh. 17, AR at 240.  However, any Kalei`opu`u teacher –
regardless of his or her level of special education training –
would have been able to recognize many of the problem behaviors
Student exhibited at Loveland, including: chasing another student
with a brick, grabbing equipment from another student, banging on
the table, lying on the ground in a fetal position, playing with
off-limits objects, leaving the room, or throwing objects.  There
is no evidence in the record that Student exhibited these types
of problematic behaviors at Kalei`opu`u.  The behavioral
regression Student experienced at Loveland – which occurred in
spite of the extensive mental health services he was receiving
there – weighs against an award of full reimbursement.

 **6.   <u>Summary</u>**

 Having considered all of the above relevant factors,
this Court, in its discretion, concludes that: 1) a reimbursement
award is appropriate under both § 1412(a)(10)(C)(ii) for the
period from November 10, 2010 to July 31, 2012, and under
§ 1415(i)(2)(C)(iii) for the period from July 6, 2010 to
November 10, 2010; 2) based on the equitable considerations in
this case, an award of full reimbursement is not warranted; and
3) an equitable award is twenty-five percent of Student's
expenses for both periods.  Plaintiffs are awarded $61,137.47

under § 1412(a)(10)(C)(ii) and $12,187.61 under

§ 1415(i)(2)(C)(iii), for a total award of $73,325.08.

### CONCLUSION

On the basis of the foregoing, the Hearings Officer's
Findings of Fact, Conclusions of Law and Decision, filed
September 12, 2011, is HEREBY AFFIRMED IN PART AND VACATED IN
PART. The Hearings Officer's rulings that Student was denied a
FAPE at the May 29, 2009 IEP team meeting and at the March 3,
2010 IEP team meeting are AFFIRMED. The September 12, 2011
Decision is VACATED insofar as this Court CONCLUDES that: the
DOE's failure to consider the Murphy-Hazzard Report and Mothers'
concerns about Student's out-of-school behavior denied Student a
FAPE; Loveland Academy was an appropriate placement for Student;
and a partial reimbursement award for Student's expenses at
Loveland is not warranted under the circumstances of this case.

Defendant is HEREBY ORDERED to pay Plaintiffs, through
their counsel, $61,137.47 under § 1412(a)(10)(C)(ii) and
$12,187.61 under § 1415(i)(2)(C)(iii), for a total award of
$73,325.08. Defendant is ORDERED to deliver payment by **July 31,
2018**, unless a motion for reconsideration or notice of appeal is
filed in this case.

In light of the Court's rulings regarding the
September 12, 2011 Decision, the Hearings Officer's June 7, 2013
Findings of Fact, Conclusions of Law and Decision After Remand

and September 26, 2013 Supplemental Findings of Fact, Conclusions of Law, and Supplemental Decision After Remand are HEREBY VACATED AS MOOT.

There being no issues remaining in this case, the Clerk's Office is DIRECTED to enter judgment immediately in favor of Plaintiffs, in the amount of $73,325.80.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, May 31, 2018.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**J.T., ET AL. VS. DEPARTMENT OF EDUCATION, STATE OF HAWAII; CIVIL 11-00612 LEK-RLP; ORDER AFFIRMING IN PART AND VACATING IN PART HEARINGS OFFICER'S ORDER DATED SEPTEMBER 12, 2011**